# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>**Plaintiff,**<br><br>v.<br><br>ARETE WEALTH MANAGEMENT, LLC,<br>ARETE WEALTH ADVISORS, LLC,<br>JOEY DALE MILLER,<br>JEFFREY SCOTT LARSON,<br>RANDALL SCOTT LARSON, and<br>UNBO CHUNG,<br><br>**Defendants.** | Civil Action No. _____<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Arete Wealth Management, LLC ("Arete Wealth"), Arete Wealth Advisors, LLC ("Arete Advisors"), Joey Dale Miller ("Miller"), Jeffrey Scott Larson ("Jeff Larson"), Randall Scott Larson ("Randy Larson"), and UnBo ("Bob") Chung ("Chung") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      From approximately October 2018 to May 2020 (the "Relevant Period"), Defendants Miller and brothers Jeff Larson and Randy Larson (together, the "Arete Representatives")—licensed sales representatives at Defendant Arete Wealth, a Commission-registered broker-dealer, and investment adviser representatives at Defendant Arete Advisors, a Commission-registered investment adviser (together with Arete Wealth, "Arete")—solicited dozens of their customers and clients to purchase stock in Zona Energy, Inc. ("Zona") without

receiving Arete's approval and therefore not subject to its compliance oversight, a prohibited practice called "selling away." In the process, Miller and Jeff Larson defrauded investors. Later, they, along with Randy Larson and Chung—Arete's general counsel and chief compliance officer ("CCO")—obtained liability waivers, which they knew contained material misrepresentations and omissions, from their advisory clients, to whom they owed a fiduciary duty. This misconduct occurred while Arete engaged in long-running violations of record-keeping provisions—through the Arete Representatives and others—and violations of compliance provisions—through Chung—of the federal securities laws.

2.      In approximately late 2018 through early 2019, Miller and Jeff Larson agreed with Zona's control person, Richard Dale Sterritt, Jr. a/k/a Richard Richman ("Sterritt"), to raise money for Zona from investors in exchange for (at least) discounted shares of Zona, and Randy Larson joined the effort.

3.      Miller and Jeff Larson did not disclose this agreement to their customers and clients—despite owing a fiduciary duty to their advisory clients—and in some cases misled them into thinking Miller and Jeff Larson were recommending the stock without receiving anything in return.

4.      To try to conceal their conduct, Miller and Jeff Larson directed their customers and clients not to email them on their Arete email accounts, and they and Randy Larson emailed Arete customers and clients about Zona from non-Arete email accounts.

5.      In January 2020, the Arete Representatives and Chung received an anonymous email alleging that Richard "Richman" was in fact Richard Sterritt, a convicted felon who had served several years in prison for conspiracy to commit securities fraud and other crimes.

6.      Yet between February and May 2020, some of the Arete Representatives' customers and clients who had previously invested in Zona invested additional funds in Zona, and the Arete Representatives at least assisted certain of these investors in doing so.

7.      By May 2020, the Arete Representatives' brokerage customers and advisory clients, along with other investors the Arete Representatives solicited, had invested more than $8.5 million in Zona—over half the total amount Zona raised from investors.

8.       In April 2021, the U.S. Attorney's Office for the Eastern District of New York and the Commission respectively filed criminal and civil charges against Sterritt and others alleging that Zona was a sham company and that Sterritt and other Zona insiders had misappropriated investor funds for luxury expenses. The Commission's complaint also alleged that three representatives of a brokerage and investment advisory firm had agreed to raise funds for Zona in return for discounted shares of Zona stock.

9.      The same day these charges were filed, the Financial Industry Regulatory Authority ("FINRA"), a self-regulatory organization overseeing brokerage firms such as Arete Wealth, sent Chung an email requesting information on whether individuals at Arete had raised funds for Zona and specifically named Jeff Larson, Randy Larson, and Miller.

10.     By the end of the month, Arete had identified approximately 120 of its customers or clients who had invested in Zona, of which approximately 60 were Miller's, approximately 40 were Jeff Larson's, and approximately 20 were Randy Larson's.

11.     To try to limit Arete's liability, Arete's chief executive officer ("CEO") demanded that the Arete Representatives obtain liability releases from their customers and clients who had invested in Zona and delegated oversight of this process to Chung, who worked with the Arete Representatives' counsel.

12.     Chung played an active role in this process and, although Arete Advisors and the Arete Representatives continued to owe fiduciary duties to their advisory clients, helped the Arete Representatives obtain broad liability releases from many of their customers and clients in return for payments typically ranging from $1 to $5,000—much less than most of these investors had invested in Zona.

13.     As Chung and the Arete Representatives knew (or at least recklessly or negligently disregarded), the releases falsely claimed that the investors understood that the Arete Representatives had not recommended investments in Zona and that the Arete Representatives were not acting as financial advisers when doing so. While the releases disclosed that Miller and Jeff Larson had purchased Zona shares at a discount, the releases misleadingly failed to disclose that Miller and Jeff Larson had received these shares in return for raising millions of dollars for Zona.

14.     The Arete Representatives' misconduct occurred while Arete Advisors failed to comply with important compliance requirements and Arete Wealth failed to comply with key recordkeeping requirements. Arete Advisors, through Chung, failed to maintain adequate compliance policies and procedures and failed to conduct required annual reviews of the firm's compliance policies for almost four years after Commission staff had warned Chung of these deficiencies in the firm's compliance program. And many employees of Arete Wealth, including its CEO and the Arete Representatives, used their personal phones to communicate about firm business without retaining these messages in violation of recordkeeping provisions of the federal securities laws.

15.     Meanwhile, the Arete Representatives' customers and clients and other investors the Arete Representatives solicited lost nearly all of the money they invested in Zona.

**VIOLATIONS**

16.    By virtue of the foregoing conduct and as alleged further herein:

(a) Arete Advisors violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7)];

(b) Arete Wealth violated Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78q(a)] and Rule 17a-4(b)(4) thereunder [17 C.F.R. § 240.17a-4(b)(4)];

(c) Miller violated Exchange Act Sections 15(a) and 10(b) [15 U.S.C §§ 78o(a) and 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 275.10b-5]; violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; violated Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], or, in the alternative, aided and abetted Arete Advisors' violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; and aided and abetted Arete Wealth's violations of Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rule 17a-4 thereunder [17 C.F.R. § 240.17a-4];

(d) Jeff Larson violated Exchange Act Sections 15(a) and 10(b) [15 U.S.C §§ 78o(a) and 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 275.10b-5]; violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; violated Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] or, in the alternative, aided and abetted Arete Advisors' violations of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; and aided and abetted Arete Wealth's

violations of Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rule 17a-4
thereunder [17 C.F.R. § 240.17a-4];

(e) Randy Larson violated Exchange Act Section 15(a) [15 U.S.C. § 78o(a)];
violated Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and
80b-6(2)] or, in the alternative, aided and abetted Arete Advisors' violations
of Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and
80b-6(2)]; and aided and abetted Arete Wealth's violations of Exchange Act
Section 17(a) [15 U.S.C. § 78q(a)] and Rule 17a-4 thereunder [17 C.F.R.
§ 240.17a-4];

(f) Bob Chung aided and abetted Arete Advisors', Miller's, Jeff Larson's, and/or
Randy Larson's violations of Advisers Act Sections 206(1) and 206(2) [15
U.S.C. §§ 80b-6(1) and 80b-6(2)] and aided and abetted Arete Advisors'
violations of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule
206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7)].

17.     Unless Defendants are restrained and enjoined, they will engage in the acts,
practices, transactions, and courses of business set forth in this Complaint or in acts, practices,
transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

18.     The Commission brings this action pursuant to the authority conferred upon it by
Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section
21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d)
and 80b-9(e)].

19.     The Commission seeks a final judgment: (a) permanently enjoining Defendants
from violating the federal securities laws and rules this Complaint alleges they have violated;

(b) permanently prohibiting Miller, Jeff Larson, and Randy Larson from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5)]. This injunction shall not prevent the Arete Representatives from being a customer or client of a broker, dealer, or investment adviser. For purposes of this requested injunction, (i) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (ii) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser; (c) permanently prohibiting Miller, Jeff Larson, and Randy Larson from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; (d) permanently prohibiting Miller and Jeff Larson from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Randy Larson from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; (f) Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)],

Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (g) ordering any other and further relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

21.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the transactions, acts, practice, and courses of business alleged in this Complaint.

22.     Venue lies in this Court pursuant to Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-1]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Northern District of Illinois, where Defendant Chung resides and where Defendants Arete Wealth and Arete Advisers had its principal offices during the Relevant Period.

## DEFENDANTS

23.     **Arete Wealth** is a Connecticut limited liability company ("LLC") with its principal office in Chicago, Illinois. It has been registered with the Commission as a broker-dealer since August 1998. In 2000, Arete Wealth was the subject of regulatory sanctions by the National Association for Securities Dealers ("NASD"), a self-regulatory organization, for alleged violations of NASD Rules 1018, 2210, and 3110 related to firm commitment underwriting. In 2012, the firm was the subject of FINRA sanctions for its alleged violations of FINRA Rule 2010 and NASD Conduct Rule 3010 based on its failure to enforce its written supervisory procedures regarding due diligence for private offerings.

24.     **Arete Advisors** is a Nevada LLC with its principal office in Chicago, Illinois. It has been registered with the Commission as an investment adviser since January 2009. According to Arete Advisors' Form ADV filed on August 15, 2024, it has approximately $2.67 billion in regulatory assets under management.

25.     **Joey Miller**, age 47, resides in New Braunfels, Texas. Miller is currently a registered representative of a broker-dealer and an investment adviser representative of an investment adviser affiliated with the same broker-dealer. From 2014 until October 2023, Miller was a registered representative of Arete Wealth and an investment adviser representative of Arete Advisors. Miller is the founder and principal of a private wealth management firm that formerly operated as a branch office of Arete and is now associated with the broker-dealer and investment adviser firm he is currently associated with. Miller holds Series 22, 63, 65, and Securities Industry Essentials ("SIE") securities licenses.

26.     **Jeff Larson**, age 41, resides in Fenton, Missouri. Jeff Larson is currently an investment adviser representative, managing partner, and co-founder (with Randy Larson) of a private wealth management firm (the "Wealth Management Firm") that formerly operated as a branch office of Arete. The Wealth Management Firm has been registered with the Commission as an investment adviser since February 11, 2022, which offers securities through a broker-dealer. From August 2017 through October 2023, Larson was a registered representative of Arete Wealth and an investment adviser representative of Arete Advisors. Jeff Larson holds Series 7, 66, and SIE securities licenses.

27.     **Randy Larson**, age 43, resides in St. Louis, Missouri and is Jeff Larson's brother. Randy Larson co-founded the Wealth Management Firm he and Jeff Larson are associated with, is an investment adviser representative of the Wealth Management Firm, and is a registered representative with the Wealth Management Firm's broker-dealer. From 2017 through October

2023, Randy was a registered representative of Arete Wealth and an investment adviser representative of Arete Advisors. He holds Series 7, 66 and SIE securities licenses. Randy Larson is also an attorney and a member of the Missouri state bar.

28.     **Chung**, age 53, resides in Chicago, Illinois. Chung has been Arete Wealth's and Arete Advisors' CCO and general counsel since at least 2014. He also supervised the Arete Representatives. Before joining Arete, Chung was a senior regional counsel for FINRA for nearly a decade. He holds Series 7, 14, 24, and 66 securities licenses. Chung is registered as an attorney with the Illinois Attorney Registration & Disciplinary Commission.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

29.     **Zona** was a privately held Texas corporation with its principal place of business in Dallas, Texas. In marketing materials, Zona described its business as "focused on the acquisition, development, exploration and exploitation of unconventional, onshore oil and natural gas reserves in the Permian Basin in West Texas." Zona was not registered with the Commission. Zona never registered any offering of its securities under the Securities Act or any class of its securities under the Exchange Act. Zona's equity security was a penny stock, as defined in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. On June 29, 2020, Zona Resources, Inc., a wholly-owned subsidiary of ERF Wireless, Inc. ("ERF")—which at the time was a publicly-traded company whose common stock was quoted on OTC Link, an electronic inter-dealer quotation system—announced that it had completed a share exchange with Zona, whereby Zona shareholders received shares of ERF. The Zona shares that investors purchased through the Arete Representatives were held by a transfer agent prior to the share exchange.

30.     **Sterritt**, age 68, is currently incarcerated at the Metropolitan Detention Center Brooklyn. In April 2003, Sterritt pleaded guilty to an indictment charging him with conspiracy to

commit securities fraud, money laundering, and filing false income tax returns. He was sentenced to five years' imprisonment. On April 14, 2021, in connection with his conduct in fraudulently operating Zona and offering its shares, Sterritt was charged in the U.S. District Court for the Eastern District of New York ("Eastern District of New York") with conspiracy to commit securities and wire fraud, multiple counts of securities fraud, and conspiracy to commit money laundering. On the same day, the Commission filed a complaint in the same federal district court charging Sterritt with violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, Sections 9(a), 15(a), and 10(b) of the Exchange Act, and Rule 10b-5 under the Exchange Act. On November 27, 2023, Sterritt pleaded guilty in the criminal proceeding to conspiracy to commit securities and wire fraud, multiple counts of securities fraud, and conspiracy to commit money laundering. Sterritt has not yet been sentenced for these crimes.

31.     **Katie Mathews ("Mathews")**, age 61, resides in Tucson, Arizona. She was an employee of Sterritt and other entities Sterritt controlled and was a director of Zona and its corporate secretary. She has never been registered with the Commission in any capacity and has never held any securities licenses. On April 14, 2021, the Commission charged Mathews with securities fraud and other violations based on her conduct related to Zona.

32.     **Christopher ("Chris") Pittman ("Pittman")**, age 53, resides in Dallas, Texas and was Sterritt's friend. At all relevant times, Pittman was a lawyer and member of the bar in Texas and a managing member and co-founder of a law firm specializing in real estate and business transactions. On April 14, 2021, the Commission charged Pittman with securities fraud and other violations in connection with the Zona fraud. On December 15, 2022, also in connection with the Zona fraud, Pittman was charged criminally in the Eastern District of New York with conspiracy to commit securities fraud, conspiracy to commit wire fraud, securities fraud, and conspiracy to commit money laundering. On October 13, 2023, Pittman pleaded guilty

11

to conspiracy to commit securities fraud and conspiracy to commit wire fraud. Pittman has not

yet been sentenced for these crimes.

## FACTUAL ALLEGATIONS

I. **Background: The Prohibition on Selling Away, Arete Advisors' Fiduciary Duties and Compliance Obligations, and Arete Wealth's Record-Keeping Obligations**

A. **Selling Away and Private Securities Transactions**

33.     During the Relevant Period, Arete Wealth was a broker-dealer firm in the

business of buying and selling securities on behalf of its customers (as broker), for its own

account (as dealer), or both.

34.     The licensed sales personnel who worked for Arete Wealth, including the Arete

Representatives, were known as "registered representatives."

35.     Exchange Act Section 15(a) requires securities brokers and dealers to register

with the Commission.

36.     FINRA requires individual registered representatives to sell all securities to

customers through the FINRA member firm with which they are associated, unless the registered

representative first has provided the firm with a required notice of a proposed transaction to be

effected "away from" the firm and unless the firm then has authorized the transaction to take

place away from the firm.

37.     In the case of the Arete Representatives, the associated broker-dealer firm from

which they were required to seek approval to sell securities was Arete Wealth.

38.     In compliance with FINRA rules, Arete Wealth's operative written supervisory

procedures throughout the Relevant Period required the firm's registered representatives,

including the Arete Representatives, to provide written notice to Arete's CEO or CCO (or their

designee) describing in detail any private securities transaction, the representatives' proposed

role in the transaction, and notice of whether they would receive any compensation from the proposed transaction.

39. The Arete Representatives were thus required to obtain written approval from Arete's CEO or CCO (or their designee) prior to engaging in any private securities transaction in which they would receive compensation.

40. If Arete Wealth approved any such transaction, Arete Wealth was required to record the transaction in its books and records and supervise the Arete Representatives' participation in the transaction as if it were executed on behalf of Arete Wealth.

41. Selling securities—which includes solicitation of an offer to buy a security—to brokerage customers without the approval of the registered representative's associated broker-dealer firm is a prohibited practice called "selling away."

42. The prohibition on registered representatives' "selling away" from their brokerage firms is an important means to enhance investor protection and deter and prevent fraud on members of the investing public by ensuring that registered broker-dealer firms are supervising their representatives when they sell securities to customers.

43. Consequently, registered representatives who "sell away" from their broker-dealer firms are acting as "unregistered brokers" in violation of Exchange Act Section 15(a).

**B.      Investment Advisers' Fiduciary Duties to their Clients**

44. During the Relevant Period, Arete Advisors, an affiliate of Arete Wealth, was in the business of providing investment advice to clients for compensation.

45. The Arete Representatives were both registered representatives of Arete Wealth and investment adviser representatives associated with Arete Advisors.

46.     As investment advisers, Arete Advisors and the Arete Representatives owed their investment advisory clients two basic fiduciary duties—a duty of loyalty and a duty of care, which apply to the entire adviser-client relationship.

47.     A duty of loyalty requires acting with the utmost good faith, making full and fair disclosure of all material facts, and employing reasonable care to avoid misleading clients. The duty to disclose all material facts includes the duty to disclose all conflicts of interest that might incentivize the adviser to render investment advice that is not disinterested. To satisfy a duty of loyalty, an investment adviser who does not eliminate a conflict of interest with its advisory client must make an adequate disclosure of such conflicts of interest to the client and obtain the client's informed consent to the conflict.

48.     The duty of care includes the duty to provide advice that is in the best interest of the client and to provide advice and monitoring over the course of the relationship.

49.     Arete Advisors' October 4, 2013 policies and procedures manual, which was in effect during the Relevant Period, explained: "As a registered adviser, and as a fiduciary to our advisory clients, our firm has a duty of loyalty and to always act in utmost good faith, place our clients' interests first and foremost and to make full and fair disclosure of all material facts and in particular, information as to any potential and/or actual conflicts of interests."

**C.      Investment Advisers' Relevant Requirements as to Compliance Policies and Procedures**

50.      To protect investors, the federal securities laws require registered investment advisory firms to create and maintain appropriate compliance policies and procedures to prevent fraud and other misconduct by the firm's advisory representatives.

51.     Advisers Act Section 206(4) and Rule 206(4)-7(a) thereunder require registered investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act.

52.     Advisers Act Section 206(4) and Rule 206(4)-7(b) require registered investment advisers to review their compliance policies and procedures annually to determine their adequacy and the effectiveness of their implementation.

**D.     Broker-Dealers' Relevant Recordkeeping Requirements**

53.     The securities laws require broker-dealer firms like Arete Wealth to retain certain records, including electronic communications.

54.     Electronic communications by broker-dealer personnel that occur on personal devices, such as text messages sent or received on personal phones that are not preserved by the broker-dealer firm, are often referred to as "off-channel communications."

55.     Rule 17a-4(b)(4), adopted under Section 17(a)(1) of the Exchange Act, requires broker-dealers to preserve for at least three years, the first two years in an easily accessible place, originals of all communications received and copies of all communications sent relating to the broker-dealer's "business as such."

56.     These provisions impose minimum recordkeeping requirements that are based on standards a prudent broker-dealer should follow in the normal course of business.

57.     These and other recordkeeping requirements protect investors by ensuring that the Commission and other securities regulators can monitor broker-dealers' compliance with securities laws.

58.     For over a decade, FINRA has advised its member broker-dealer firms about the applicability of Rule 17a-4(b)(4) to off-channel communications.

59.    For instance, in an August 2011 notice, FINRA told member firms that the requirement to retain communications under Rule 17a-4(b)(4) "would apply if the electronic communication was received or sent by an associated person through a third-party's platform or system."

60.    A broker-dealer's failure to retain records including off-channel communications violates Exchange Act Section 17(a)(1) and Rule 17a-4(b)(4) thereunder.

61.    As early as 2017, Arete Wealth's Written Supervisory Procedures (the "Arete Wealth Procedures") included certain provisions designed to address Rule 17a-4(b)(4).

62.    Specifically, the Arete Wealth Procedures mandated that "[b]usiness-related emails must *not* be sent from non-Firm approved email accounts" (emphasis added) and required the retention of all "retail and institutional communications." The Arete Wealth Procedures made clear that retail communications (meaning communications with a certain number of individual investors), institutional communications, and correspondence were subject to review by the firm's CCO or his designee.

63.    At least as early as 2017, the Arete Wealth Procedures also required the preservation, for a period of at least three years, "[e]lectronic versions of the originals of all communications received and copies of all communications sent by the Firm," and prohibited instant messaging.

64.    In prohibiting instant messaging, the Arete Wealth Procedures cited the FINRA 2011 guidance stating that the retention requirements in Rule 17a-4(b)(4) would apply to electronic communications sent or received by a broker-dealer's associated persons (which included registered representatives) using personal devices or technology.

65.    In May 2023, Arete Wealth issued revised Procedures that continued to require the retention of all retail and institutional communications according to Rule 17a-4 but also

"prohibit[ed] the use of personal e-mail addresses, personal social networks, and other personal electronic communication channels for business-related communications."

66.     These revised Procedures also dictated that business-related text messages could be sent only via firm-approved platforms.

67.     In at least 2021 and 2022, Arete Wealth's registered representatives, including the Arete Representatives, were required to complete an annual compliance questionnaire that included the statement, "I understand that the only acceptable methods of communication with clients is in person, over the telephone or by email."

68.     In 2023, the annual compliance questionnaire was revised to include the statement, "I understand that the only acceptable methods of communication with clients is in person, over the telephone, through an Arete Wealth authorized email address or through the firm-approved texting app, MyRepChat."

## II.     The Arete Representatives Unlawfully "Sell Away" Zona Securities Without Arete Wealth's Authorization.

### A.     Background: The Zona Fraud

69.     Beginning in early 2018 through at least November 2020, Sterritt and his associates raised more than $16 million from over 300 investors through a purported "private placement" of Zona common stock in nationwide offerings. As a "private placement," these shares were purportedly only offered to select investors rather than to the general public through an open exchange.

70.     The fraudulent scheme began in early 2018, when Sterritt caused Zona to acquire, through significant debt, certain leasehold mineral rights on the La Escalera Ranch (the "Ranch"), a cattle ranch located in the oil-and-natural-gas-rich Permian Basin region of West Texas.

71.    Sterritt—under the alias "Richard Richman"—and his associates then began selling Zona shares and used the leasehold mineral interests in the Ranch to attract investors and give Zona an air of legitimacy.

72.    Sterritt lied repeatedly about Zona and failed to disclose to investors material facts—including that Sterritt was a felon who had previously been convicted of securities fraud and served several years in prison for his crimes.

73.    Instead of using investor funds for Zona as he had represented to investors, Sterritt misappropriated nearly all the money raised and used it for luxury goods—including for a Bentley; for cash gifts to his family, friends, and girlfriends; to pay others involved in the scheme; for various personal expenses; and for unrelated businesses he controlled.

74.    Ultimately, Sterritt, as alleged in more detail in paragraph 30 above, and six other defendants were criminally charged and convicted of securities fraud and other crimes in connection with the fraudulent Zona scheme.

75.    The Zona investors, including the investors the Arete Representatives solicited, lost nearly all the money they invested in Zona.

**B.    The Arete Representatives Agree to Raise Capital for Zona from Investors and Raise Significant Amounts from Their Customers and Clients While Personally Investing in Zona, Often at Discounted Prices.**

76.    Pittman, as a director of Zona, worked closely with Sterritt in his efforts to raise funds for Zona.

77.    In the spring of 2018, Pittman introduced Zona to his friend, Michael Sealy ("Sealy"), who subsequently invested in Zona.

78.    Sterritt, Pittman, and Sealy agreed that Sealy would work to recruit additional Zona investors and, in exchange for his solicitation efforts, would receive compensation in the form of cash and discounted shares.

79.     Although Sealy never received cash, he was compensated in the form of heavily discounted shares, purchasing hundreds of thousands of shares for $0.01 per share.

80.     One of the investors Sealy solicited was Miller, a business acquaintance, who first purchased Zona shares in October 2018.

81.     Miller then pitched Zona to certain Arete colleagues, including Jeff Larson, who in turn introduced the potential investment to his brother, Randy Larson.

82.     The Arete Representatives all invested in Zona, and, at the time, Zona was selling its shares for $1 per share.

83.     In September 2018, Miller submitted a standard form used to notify Arete Wealth of a registered representative's outside business activity, in accordance with the firm's Procedures.

84.     In the form, Miller indicated that Zona was a personal investment from which he derived no compensation and that did not involve any Arete customers as part of the business or as potential customers of the business.

85.     Jeff Larson and Randy Larson failed to provide any notice of their Zona investments to Arete Wealth, despite the Arete Wealth Procedures' requirement to do so.

86.     Because Arete Wealth had not approved investments in Zona for its customers, the Arete Representatives were prohibited from acting as brokers for Zona.

87.     The Arete Representatives therefore could not receive commissions by brokering transactions for Zona investments.

88.     Yet by early 2019, Miller and Jeff Larson reached an initial agreement with Sterritt—who used his "Richard Richman" alias in communicating with the Arete Representatives—to raise capital for Zona by selling Zona shares to investors.

89.     Instead of receiving commissions through Arete, as they normally would as broker-dealer representatives, Miller and Jeff Larson agreed to solicit investors in exchange for receiving discounted shares of Zona stock.

90.     Randy Larson also agreed to raise capital for Zona.

91.     From at least late 2018 to early 2019, Miller and Jeff Larson each exchanged texts with Sterritt about their arrangement to solicit investors for Zona at $2.50 per share in exchange for compensation, as described in the examples set forth in paragraphs 92 through 105 below.

92.     On December 18, 2018, at 4:53 p.m., Sterritt texted Jeff Larson:[1]

> Jeff , thank you for taking time out of your schedule to come meet with us. I felt good after meeting you and your associates . I think we can work out a very mutually beneficial relationship and look forward to talking with you again soon.[2]

93.     Jeff Larson responded to Sterritt, "Agreed Richard. We are very intrigued and would love to get this off the ground."

94.     The next month, on January 9, 2019, at 6:06 p.m., Miller sent a text message to Sterritt to confirm the price at which he and Jeff Larson would sell the Zona shares. Miller asked Sterritt, "2.5 a share right?," and Sterritt responded, "Yes sir."

95.     On January 9, 2019, at 8:06 p.m., Jeff Larson texted Sterritt that he and Miller would each initially raise $1 million for Zona: "Hi Rich, Please hold 2M total for Joey and me. We will both get in 1m."

96.     On January 10, 2019, at 2:42 p.m., Miller texted Sterritt that he had already raised $1,120,000: "Are jeff and I raising 2.5 or 2 I ask because I'm at 1120000 right now including my

---

[1]     All times alleged in this Complaint are in Pacific Time.

[2]     All typographical errors in the emails and text messages alleged throughout this Complaint appear in their original form.

200k And Jeff and I are splitting it So if It's 2m I'm 120k over and I have t even scratched the surface."

97.    Sterritt responded, "Your unbelievable!"

98.    On January 11, 2019, at 7:20 p.m., Miller updated Sterritt on Miller's progress: "I'll have another million in the next day or 2. I'm Just having a lot of people dip their toe in."

99.    Two minutes later, Miller texted Sterritt about his and Jeff Larson's desired role in raising capital for Zona: "We want to be the 2 guys you send in the field to talk to your clients who have interest and we'll lock them In and be your voice so you can focus on the company and not have to mess with capital."

100.    Later that day in the same conversation, Sterritt responded to Miller: "You guys keep up the good work and I assure you I am a fair man."

101.    Miller responded later the same day: "I never ask for a handout I'll prove a great partner over time."

102.    Continuing his previous comment about being a "fair man," Sterritt wrote in the same text conversation that day: "And generous!!! Ask Kate [Matthews] or the girls or any one who has worked for me."

103.    Also in the same text conversation that evening, Sterritt told Miller: "I really appreciate Michael [Sealy] making the decision to bring you guys on the team."

104.    Miller responded, "Yeah me too," and, referring to Jeff Larson, added, "And I'm happy I brought Jeff in," and later added, "He can raise as much as me. We are a great team."

105.    Three days later, on January 14, 2019, at 10:39 a.m., referring to the amount he had already raised for Zona from investors, Jeff Larson texted Sterritt: "I have my 1.25m lined up, chat soon."

106.    By February 2019, the Arete Representatives had each already solicited numerous investors, who had paid $2.50 per share for Zona stock.

107.    At approximately the same time as the investors paid $2.50 per share, Miller and Jeff Larson each purchased thousands of Zona shares at $1 per share.

108.    Later in 2019, Zona insiders worked towards reaching additional agreements with Miller and Jeff Larson to continue raising capital for Zona.

109.    On July 11, 2019, a Zona insider wrote in an email to another Zona insider, on which Sterritt and Pittman were copied: "Need agreement with Michael Sealy, Joey Miller, Jeff Larson for continued selling activities for future partnerships. There is no agreement other than verbal bull[expletive] with regard to their participation ($10,000)."

110.    During the Relevant Period, the Arete Representatives sold over $8.5 million of Zona stock to investors, including approximately 120 brokerage customers and/or advisory clients of Arete Wealth or Arete Advisors, respectively, who in total purchased approximately $6.3 million of Zona shares.

111.    The Arete Representatives raised more than half of the total amount of money Zona raised from investors.

**C.    The Arete Representatives Actively Sell Zona Stock to Their Customers and Clients and Do So Without Arete's Involvement.**

112.    During the Relevant Period and largely during telephone calls or in-person meetings, the Arete Representatives encouraged certain customers and clients to invest in Zona by recommending Zona to them—including, in Miller's and Jeff Larson's case, with material misrepresentations and omissions, alleged below in Section III.

113.    For example, on April 17, 2019, Jeff Larson sent an email from his personal email address to one of his advisory clients—an entity that ran a summer camp and conference center

(the "Camp")—and pitched the Camp on investing in Zona (the "Camp Email"): "I will tell you that the buy is $2.50/share, I think it goes public around June at over $10/share. I think in 2 years it can be at 35-50/share and has legs to go over 100/share."

114.    At times, the Arete Representatives discussed Zona during routine investment meetings with clients, in which the Arete Representatives also discussed investments that Arete had approved its representatives selling.

115.    Instead of selling Zona shares through Arete, the Arete Representatives connected dozens of investors to a Zona employee, Mathews, who then provided the investors with necessary paperwork and accepted payment for the shares.

116.    Investors' funds thus flowed directly to Zona without passing through Arete or the Arete Representatives.

117.    For example, on January 19, 2019, an investor sent an email to Mathews, on which Miller was copied, and wrote: "Katie, we spoke to Joey Miller and we are wanting to invest $50,000 in the project. Please let us know what we need to do to wire the money next week."

118.    Similarly, on January 21, 2019, Randy Larson sent an email to Mathews from his law firm's email account (not his Arete email account) and copied the relevant investor: "Hi Katie – [investor] would like to invest 2,500. I'll let him follow up with you on details, thanks!"

119.    On March 6, 2019, in another example, Jeff Larson sent an email to Mathews from his personal email account with the names and contact information for two of his advisory clients and told Matthews that that they wanted "$5k worth of shares."

120.    On March 2, 2019, one of Randy Larson's advisory clients emailed Mathews and wrote: "Mr. Randy Larson encouraged us to connect with you regarding Zona investments."

121.    On April 12, 2019, Randy Larson sent Mathews an email with the subject line "Zona at 2.5/share" and copied a potential investor.

122.    In his email, Randy said, "Hi Katie, [investor] would like to invest, thx!"

123.    On April 23, 2019, Randy Larson's advisory client sent an email to Mathews that Randy Larson "informed us yesterday that the $2.50/share price is still being offered to some investors. Would that be an option for us?"

124.    The Arete Representatives also played an active role in closing their sales of Zona shares, as alleged in more detail in the examples below.

125.    On January 22, 2019, an investor asked Miller, when other investors were paying $2.50 per share for Zona stock, "[I]f I put $20k into Zona, can you get me in at the $1 per share price?," and Miller responded, "For you guys??? Consider it done. I'll go to bat."

126.    In February 2019, this investor purchased $20,000 of Zona shares at $1 per share, while nearly all of Miller's other investors, including his advisory clients, paid $2.50 per share.

127.    On February 13, 2019, Randy Larson sent an email to Mathews telling her that he had advised one of his investors to "wire the money" for a $10,000 investment in Zona.

128.    On February 27, 2019, Jeff Larson sent an email to Mathews to provide her with the "proper titling" for the paperwork for one of his advisory client's investments in Zona.

129.    On March 11, 2019, Jeff Larson sent an email to Mathews that one of his advisory clients and his wife wanted to purchase $25,000 worth of Zona shares and asked Mathews to get information from him, including "the name of his trust to prepare the paperwork."

130.    On March 18, 2019, Jeff Larson sent an email to Mathews with the contact information for an advisory client who wanted to invest $50,000 and told Mathews to "text him if you need anything."

Case: 1:25-cv-00616 Document #: 1 Filed: 01/17/25 Page 25 of 57 PageID #:25


131.    On March 27, 2019, one of Miller's advisory clients sent him an email saying: "Hi Joey, I'll give Katie [Mathews] a call tomorrow for my personal info. Did you guys get my text about using $10k out of my TD Ameritrade account? Can those funds be transferred from there?"

132.    On April 12, 2019, one of Randy Larson's advisory clients sent him an email asking, "When will the liquidation in my account be available to invest with zona[?]"

133.    Randy Larson responded, "Liquidated money available Monday."

134.    On April 26, 2019, Jeff Larson texted Sterritt to seek Sterritt's help in convincing one of Jeff Larson's advisory clients to invest more money in Zona than the client had originally intended:

> Rich, I want to introduce you to my friend John. I shared Dicks report with him. He is in Zona for 100k, but I told him with his net worth, he may want to consider more. John had some more detailed questions you would be better off answering. He is available to chat Monday after 10am. Would you mind connecting?

135.    At least some Arete customers and clients did not differentiate Zona from their other Arete investments and continued to seek advice from the Arete Representatives about Zona, just as they did about other Arete investments.

136.    For example, on March 27, 2019, one of Miller's advisory clients emailed Miller a list of investments missing from her investment sheet, including Zona and other Arete investments.

137.    On August 13, 2019, after one of his advisory clients had asked him a question about how to complete forms required for her Zona investment, Randy advised her by email to say that she was an "individual subscriber" but that, if she used cash, she should list her husband as a "co investor."

138.    On January 7, 2020, one of Jeff Larson's advisory clients, who had already purchased Zona shares, emailed Jeff Larson to ask him for help understanding some paperwork from Zona and whether it made sense for him to purchase more shares.

**D.    Zona Tracks Which of the Arete Representatives To "Credit" for Selling Shares to Each Investor.**

139.    Rather than keep track of which investors each of the Arete Representatives had solicited through Arete's books and records, Miller and Jeff Larson received periodically-updated spreadsheets from Mathews matching each investor to the Arete Representative who had solicited that investor.

140.    Mathews also checked with Randy Larson to ensure that she was not missing any investors attributable to him.

141.    The spreadsheets that Mathews sent to Miller and Jeff Larson included the dollar amount each investor invested and the number of shares each investor purchased.

142.    Mathews kept these records at least in part to credit the one of Miller, Jeff Larson, or Randy Larson who solicited each investor on the list.

143.    On January 24, 2019, Mathews sent a group text message to Miller, Jeff Larson, and Randy Larson when she did not know which of them to credit after receiving funds from Zona investors who, instead of sending personal checks in their own names, had sent checks in the names of entities associated with them. Mathews wrote: "Do either of you [sic] know who would be associated with [a particular entity]? we received $50k today and I dobt know who to credit. Also, yesterday we received another $50k from [a different entity]. Again, no name so I don't know who it is from. Please advise."

144.    Miller responded, "I don't think that's me I'm Guessing the Larson duo knows."

145.    Randy Larson responded next with names of possible investors whom he had solicited but said he would need to check with the investors themselves if they were associated with those entities.

146.    Jeff Larson responded last and provided the correct name of one of the investors he solicited who had sent one of the checks to Mathews.

147.    Mathews checked with the Arete Representatives to ensure that the lists were accurate and that all the investors on the lists had completed the required paperwork to invest in Zona.

148.    The Arete Representatives followed up with investors to ensure that they had completed paperwork Mathews sent them and had sent in their money.

149.    On May 30, 2019, Jeff Larson sent an email to Mathews: "I need to get on the phone and make some things happen this afternoon. Please send me a list of all investors who have signed documents but have not yet funded (make sure commitment amounts show) please. Another list of any investor who has not yet signed and has not yet funded and committed amount."

150.    On August 5, 2019, after Mathews had sent him an email with a list of investors who had not filled out suitability forms required for them to invest in Zona, Randy Larson responded to Mathews by email: "Hi Katie – did all my people fill out suitability and sign sub docs? If not, let me know who and I'll help track down. thx."

**E.      The Arete Representatives Try to Conceal Their Zona Investor Solicitations.**

151.    The Arete Representatives tried to avoid discussing Zona on their work email accounts, as described in more detail in the examples below.

152.    On January 11, 2019, Miller sent a text message to Sterritt saying: "We have to be careful as we don't want any comment of this on our security emails."

153.    On March 12, 2019, Jeff Larson instructed Matthews by email: "Also, please do not NOT email any of us at [Wealth Management Firm] about Zona."

154.    Mathews responded, "I am aware I am not to send you and Joey emails at work. If I have sent emails to work, its because they emailed me from work and I simply hit 'reply'."

155.    On March 18, 2019, Randy Larson sent an email from his Arete email account to two of his clients who had invested in Zona but carefully avoided spelling out the name "Zona" in his email: "Emailing now about Z from different account."

156.    On March 27, 2019, Miller sent an email to a client in response to her email to his work account referencing Zona and, despite having solicited the client to invest in Zona, wrote: "I don't know what ZONA IS!! I Call me on that one plz."

157.    On April 17, 2019, in the Camp Email from his personal email account, Jeff Larson wrote: "I need to email this opportunity away from my work email."

158.    On May 20, 2019, Mathews sent an email to Sterritt and other Zona insiders and wrote: "I just spoke with Jeff Larson on an unrelated matter. . . . Jeff would like to navigate all questions away from himself and Joey, if possible, especially to their business emails. (he said some investors just don't get that)."

159.    The following year, on March 4, 2020, Pittman sent Mathews an email about Zona and instructed Matthews: "Katie please text (NOT EMAIL) Joey a list of his investors."

160.    Matthew responded, "I understand he can't get emails regarding this."

**III.    Miller and Jeff Larson Make Material Misrepresentations and Omissions to Investors, Including Their Advisory Clients, When Selling Them Zona Stock.**

161.    In phone calls and meetings during the Relevant Period in which they solicited investors to purchase Zona shares, Miller and Jeff Larson did not disclose to their investors,

including their advisory clients, that they had an agreement to raise capital for Zona in exchange for compensation in the form of discounted shares of Zona stock.

162.    During the Relevant Period, Miller and Jeff Larson also misrepresented to certain investors, including Miller's and Jeff Larson's advisory clients, that they were not making any money from Zona or suggested that they were recommending Zona only as a friend, as alleged below.

163.    For example, on April 17, 2019, in his Camp Email, Jeff Larson falsely claimed to the Camp: "The money needs to be in by end of April. It doesn't go through me as this is direct with Zona. I have no benefit from this, I just love camp and all you guys do to guide it to future years."

164.    In a follow up email to the Camp a few days later, on April 23, 2019, Jeff Larson wrote: "I don't think there is anything wrong from my end as I'm getting no pay for making the connection of Camp and Zona, so no benefit to me."

165.    On April 25, 2019, the Camp purchased $50,000 worth of Zona shares at $2.50 per share.

166.    Miller told at least one of his advisory clients that he was recommending Zona as a friend.

167.    Miller told at least another one of his advisory clients that he was not making any money from his client's investment in Zona.

168.    Miller told at least one of his other advisory clients that he was not receiving a commission for his client's Zona investment.

169.    Jeff Larson told at least one investor that he was never compensated for anyone's investment in Zona.

170.    Jeff Larson told at least one of his other advisory clients that Zona had a lot of potential and that he was bringing it to the investor's attention as a friend.

**IV.    FINRA Uncovers Jeff Larson's Solicitation of a Zona Investor, and Randy Larson and Jeff Larson Lie in Forms They Submit to Arete.**

171.    In September 2019, during an on-site FINRA examination of Jeff Larson and Randy Larson's Arete branch office, a FINRA examiner provided Chung with a hard copy of Jeff Larson's April 2019 Camp Email.

172.    The same month, Jeff Larson and Randy Larson submitted outside business activity forms to Arete regarding Zona, the same form that Miller had submitted in 2018.

173.    Miller did not update the outside business activity form he had submitted in 2018.

174.    In response to the question, "Does this activity involve Arete customers (either as part of the business or as potential customers of the business)?", Jeff Larson responded, "No."

175.    In response to the same question, Randy Larson also responded, "No."

176.    In response to the question, "What is your position, title or relationship with this outside business?", Jeff Larson responded, "Investor."

177.    In response to this same question, Randy Larson responded, "Stockholder."

178.    In response to the directive, "Describe your duties and responsibilities as well as the products and services offered to this business:" Jeff Larson responded, "I have no duties, just invested personal money into the opportunity."

179.    In response to this same directive," Randy Larson responded, "none."

180.    In response to the directive, "Provide the date this activity began:" Jeff Larson responded "04/15/2019."

181.    In response to this same directive, Randy Larson responded, "04/01/2019."

182.    Following FINRA's examination, Chung interviewed each of the Arete Representatives about Zona.

183.    A review by Chung (or anyone else in Arete's compliance department) of the Arete Representatives' email in November 2019 would have uncovered dozens of emails about Zona with Arete clients or customers or others, notwithstanding the Arete Representatives' efforts to keep these communications off Arete's email system, as alleged above.

184.    Chung did not contact any Arete customers or clients to whom the Arete Representatives had recommended Zona.

185.    On November 1, 2019, Chung informed each of the Arete Representatives by letter (in three separate letters) that he was placing them on heightened supervision.

186.    In each of his letters to the Arete Representatives, Chung wrote:

> You had previously verbally informed me about your intention to personally invest in Zona stock but you were instructed not to introduce this security to any Arete clients since this oil and gas investment was so speculative…. FINRA rules do not permit the recommendation of securities away from the firm.

187.    Chung's letter to Miller addressed certain emails in which Miller discussed Zona with Arete clients. Chung wrote:

> Based my conversations with you regarding this incident, I have concluded that you discussed the investment with two close, longtime friends who are also clients of the firm…. I understand that you did not receive any remuneration of any sort if your friends actually invested in Zona.

188.    By November 1, 2019, Miller had in fact solicited at least 50 of his customers and clients to invest in Zona, most of whom had paid $2.50 per share, and Miller had received 480,000 shares of Zona at $0.50 or $1.00 per share.

189.    In his November 1, 2019, letter to Jeff Larson, Chung wrote:

> As you know, FINRA has detected an April 17, 2019 email you sent to
> one of your clients, [the] Camp, via your personal email account where
> you appeared to have recommended an unapproved security product called
> Zona…. Based my [sic] conversations with you regarding this incident, I
> have concluded that you genuinely intended to perform a charitable act by
> introducing the stock to your client and that you in no way stood to gain
> any financial gain by doing so.

190.    By November 1, 2019, Jeff Larson had in fact solicited at least 30 clients for

Zona, most of whom had paid $2.50 per share, and Jeff Larson had received 679,864 Zona shares

at either $0.50 or $1.00 per share.

191.    In his November 1, 2019, letter to Randy Larson, Chung addressed certain emails

that FINRA had detected in which Randy Larson had discussed Zona with clients, and

Chung wrote:

> Based on my conversations with you regarding this incident, I have
> concluded that you discussed the investment with several close, longtime
> friends who are also clients of the firm. I understand that you discussed
> Zona with your friends in casual social settings when they prompted you
> to discuss your personal investments.

192.    By November 1, 2019, Randy Larson had in fact solicited at least 15 clients to

invest in Zona, all of whom had paid $2.50 per share.

193.    Chung told the Arete Representatives that they would be assessed heightened

supervision fees of $5,000 per month effective November 15, 2019, which he explained in a

November 5, 2019 email to Randy Larson was "designed to provide us with a very thin cushion

should we be dragged into an arbitration."

194.    According to Arete's Procedures, heightened supervision measures could include

a daily review of activity, frequent contact with customers by the supervisor, pre-approval of all

communications, and attendance in an outside training program.

195.    The only one of these measures Chung imposed on the Arete Representatives was

the requirement to attend an outside training program.

196.     By December 10, 2019, Chung, Arete's CCO and Miller's supervisor, had removed Miller's heightened supervision and told him by email:

> Joey, After our phone call, I am persuaded that heightened supervision is unwarranted and no additional measures will be imposed against you. Specifically, I am convinced that you did not introduce the investment to any investor and any of your clients who ultimately decided to invest did so based on knowledge obtained from sources other than you.

## V.     An Anonymous Email Reveals Sterritt's Alias and Prior Criminal Conviction to the Arete Representatives, Zona Investors, and Chung.

197.     On or around January 19, 2020, the Arete Representatives (along with at least some other Zona investors) received an anonymous email stating that "Richard Richman" was an alias of Sterritt, that he had federal convictions for conspiracy to commit securities fraud and filing false tax returns, and that he had served several years in prison. The email accused Sterritt of "business catfishing" in connection with Zona by creating a fake identify to target victims for deception or fraud.

198.     The day he received this email (the "Catfishing Email"), Jeff Larson called Sterritt to alert him to it and to warn him of the inevitable ensuing investor alarm.

199.     During the call (which Sterritt recorded), Sterritt told Jeff Larson that he had changed his name eight or nine years prior, previously pleaded guilty to fraud, and spent time in prison.

200.     Jeff Larson asked Sterritt to figure out how to "get ahead" of the allegations.

201.     Jeff Larson advised Sterritt to "fight fire with fire," issue press releases, make public statements, distinguish Zona from his prior dealings, and have someone credible vouch for Zona to "shut down the fears."

202.     Sterritt assured Jeff Larson that he would do so.

203. During the call, Jeff Larson, concerned that the Catfishing Email would be sent to his work email account, told Sterritt:

> [I]f one person on our group at the front end of this deal decides to
> forward that email to my – my work [inaudible] – which I'm sure
> somebody will because they're all dummies – somebody will do it, now
> it's in – on my work email. Now I'm – which is completely regulated
> right now.

204. On January 27, 2020, Chung received a copy of the Catfishing email from another Arete representative—not Miller, Jeff Larson or Randy Larson.

205. After learning of the Catfishing Email, Chung reported to a Commission staff member that he had received an email indicating that Zona appeared to be a fraud.

206. Chung did not tell the Commission staff that the Arete Representatives had previously sold Zona to investors or that he had placed them on heightened supervision as a result.

## VI. Miller and Jeff Larson Continue At Least to Assist Their Clients in Purchasing More Zona Shares.

207. By February 6, 2020, Zona had completed its one-for-one exchange with ERF, and Zona was offering additional shares of ERF for $1 per share.

208. On that date, the Arete Representatives each received 250,000 ERF shares they had purchased at only $0.04 per share.

209. Meanwhile, from February 6 through May 6, 2020, at least 31 of the investors whom the Arete Representatives had previously solicited to invest in Zona again invested in Zona, now ERF, at $1 per share.

210. None of the Arete Representatives informed their clients that they had purchased shares at a lower price than their clients had paid.

211.    On March 5, 2020, Jeff Larson texted one of his advisory clients with instructions to contact Mathews and wrote, "Rich [Sterritt] confirmed $1/share."

212.    On March 17, 2020, the client invested $400,000 in Zona (ERF), and, on May 6, 2020, an additional $100,000.

213.    On March 9, 2020, Miller texted Mathews that two of his clients wanted "to put 10k in at 1 a share they will call."

214.    Mathews responded to Miller by text, "She just called. She wants to put in $25k. At $1.00 per share."

215.    Miller responded, "Yup. Let's get docs out ASAP," and Mathews replied, "On it."

216.    The next month, on April 24, 2020, Jeff Larson texted Mathews and asked her to connect with one of his investors, who wanted to purchase more Zona (ERF) shares.

217.    These 31 investors also lost nearly all of their money.

**VII.    The Commission Files a Complaint Against Sterritt and Others, Which References the Arete Representatives' Role in Selling Zona Shares.**

218.    On April 8, 2021, a FINRA representative requested that Chung provide a list of customers of Randy Larson, Jeff Larson, or any other Arete Wealth clients whom "the firm believes invested in Zona Energy, along with the dates and amount of each such investment."

219.    On April 14, 2021, the Commission filed a complaint in the Eastern District of New York charging Sterritt and six others with defrauding investors and engaging in market manipulation in connection with the Zona fraud.

220.    The same day, the Commission issued a press release about the complaint.

221.    Without naming the Arete Representatives, the complaint alleged:

Sterritt and Pittman became acquainted with three dually-registered investment adviser individuals/registered representatives at a dually-registered investment adviser/broker-dealer firm, and, in exchange for their commitment to raise at least $3 million, allowed the representatives

35

to buy Zona shares for as little as $0.04/share, compared with the $1.00/share or $2.50/share price typically offered to other investors.

222.    On that same day, the U.S. Attorney's Office for the Eastern District of New York filed an indictment charging five defendants, including Sterritt, with conspiracy to commit securities fraud, wire fraud, and money laundering, among other offenses, in connection with the Zona fraud.

223.    Also on April 14, 2021, a FINRA representative forwarded the Commission's press release to Chung with a cover email requesting certain information about Zona:

> Bob, below is a SEC press release. I presume that Arete confirmed that no one other than Jeff Larson, Randy Larson [and two other Arete representatives] had any involvement with Zona Energy? Please send me an email confirming it. In addition, please let me know if Joey Miller brought Zona to the attention of investors.

224.    On April 16, 2021, in response to FINRA's request earlier that month, Chung instructed Arete personnel to cross-reference public over-the-counter market disclosures listing investors in Zona with lists of Arete customers and clients.

225.    Chung received a copy of the list later that day.

226.    From the list, Arete personnel identified approximately 150 Arete clients who had invested in Zona, 120 of whom were clients or customers of one of the Arete Representatives.

227.    The list showed that approximately 60 of Miller's clients or customers had invested in Zona.

228.    The list showed that approximately 40 of Jeff Larson's clients or customers had invested in Zona.

229.    The list showed that approximately 20 of Randy Larson's clients or customers had invested in Zona.

230.    Neither Chung, not anyone else in Arete's compliance department, contacted any Arete clients regarding any Arete representatives' involvement, including the Arete Representatives' involvement, with their Zona investments.

231.    On April 22, 2022, Chung provided the list to a senior director at FINRA.

232.    In his letter accompanying the list, Chung claimed: "As we have previously discussed, Arete does not have business records related to Zona investments made by any of our clients."

## VIII.  Chung and the Arete Representatives Procure Releases, Containing Material Misrepresentations and Omissions and Unlawful Liability Waivers, from Clients.

### A.  Arete Demands That the Arete Representatives Obtain Liability Releases from Arete Clients and Customers, and Chung Helps Lead the Effort.

233.    Arete Wealth's Procedures dated January 25, 2021, prohibited a firm representative from making any payment to Arete Wealth customers to resolve an error or customer complaint without express authorization from Arete.

234.    The same Procedures also made clear that "[t]he CCO and/or the CEO…is responsible for reviewing preliminary drafts of settlement agreements prior to execution by a customer (current or former)" and for "determining that the terms and conditions are reasonable, in accordance to just and equitable principles of trade, compliant with applicable state regulations, and do not contain any impermissible confidentiality provisions, complaint withdrawal provisions, or require the customer to repudiate or contradict prior claims or complaints."

235.    In approximately the end of April 2021, Arete's CEO convened a conference call with the Arete Representatives, their individual counsel, Chung, and other members of Arete's management.

236.    Addressing the Arete Representatives, Arete's CEO chastised them on the call for involving Arete customers and clients with Zona and told them: "You came into my living room and took a giant [expletive] on my rug."

237.    Arete's CEO demanded that the Arete Representatives hire and pay for an outside law firm to draft settlement agreements releasing Arete from liability and that the Arete Representatives ask their Arete customers and clients who had invested in Zona to sign those releases.

238.    Arete's CEO delegated oversight of the releases to Chung, who worked with the Arete Representatives' counsel.

239.    As Arete's CCO and the Arete officer to whom Arete's CEO had delegated oversight of the releases, Chung was responsible for reviewing the releases before Arete's customers and clients signed them.

240.    Beginning on April 27, 2023, Chung participated with the Arete Representatives' individual counsel in numerous phone calls and emails regarding the releases.

241.    Chung took an active role in shaping the contents of the releases.

242.    Chung instructed the Arete Representatives to include a clause in each release claiming that the Arete customer or client had not made his or her Zona investment through the recommendation of an Arete representative.

243.    Chung directed the Arete Representatives to pay customers and clients out of pocket for signing the releases.

244.    As directed, the Arete Representatives sought to have their advisory clients who had invested in Zona sign the liability releases in return for payments.

245. While Arete and the Arete Representatives sought releases from their advisory clients, Arete and the Arete Representatives continued to act as their clients' investment advisers and therefore continued to owe them a fiduciary duty.

246. Meanwhile, on May 9, 2021, Arete's CEO sent Chung and Arete's chief operating officer a concerned email: "Heads up: I am worried that Jeff Larson's biggest clients may be possibly gearing up for litigation against him and/ or us."

247. On the face of each release, the only parties to each release were ostensibly the Arete customer or client, on the one hand, and the relevant Arete Representative, on the other hand.

248. The Arete Representatives counter-signed the releases for each of their respective clients.

### B. The Releases Contain Material Misrepresentations and Omissions, as Chung and the Arete Representatives Know.

249. Each of the releases falsely claimed that the relevant Arete customer or client who had invested in Zona "understood that [the relevant one of Miller, Jeff Larson, or Randy Larson] was not recommending an investment in Zona Energy, Inc. nor was [he] acting as a financial adviser to INVESTOR" regarding the investors' purchases in Zona.

250. The releases Miller's and Jeff Larson's clients signed disclosed—as Miller and Jeff Larson had not done when they solicited their clients to invest in Zona stock—that Miller and Jeff Larson had paid less for Zona shares than the investors whom they had solicited: "INVESTOR is also aware that [Miller or Jeff Larson] purchased some shares in Zona at a price per share less than INVESTOR paid, however, INVESTOR did not consider or ask what [Representative] paid in making the decision to purchase."

251.    The releases did not disclose that Miller and Jeff Larson received discounted Zona shares in return for agreeing to raise and in fact raising millions of dollars for Zona from investors, including their Arete customers and clients.

### C.    The Releases Unlawfully Purport to Release Arete from the Fiduciary Duty It Owed Its Advisory Clients, as Chung Knows or At Least Recklessly or Negligently Disregards.

252.    The federal securities laws prohibit investment advisers from contracting to waive the fiduciary duties that they owe their clients.

253.    As the general counsel and CCO for a registered Commission broker-dealer and investment adviser, Chung knew or at least recklessly or negligently disregarded this prohibition.

254.    Most of the Releases contained broad language that purported to waive all claims—not just those related to Zona—against both Arete Wealth and Arete Advisors.

255.    Most of the Releases stated in relevant part:

Mutual Release. In consideration of the Parties' mutual desire to avoid litigation, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, INVESTOR, on the one hand, hereby releases [the relevant Arete Representative], Arete Wealth Advisors, LLC, Arete Wealth Management, LLC, and each of their past, present and future agents, representatives, shareholders, members, managers, principals, attorneys, affiliates, parent corporations, subsidiaries, officers, directors, employees, predecessors and successors and heirs, executors and assigns, from any and all legal, equitable or other claims, counterclaims, demands, setoffs, defenses, contracts, accounts, suits, debts, agreements, actions, causes of action, sums of money, reckoning, damages, judgments, findings, controversies and disputes, and any past, present or future duties, responsibilities, or obligations, whether known or unknown, including, but not limited to, those claims that may arise relating to Zona Energy, Inc.

256.    This language purported to broadly limit Arete Advisors' liability by representing that the client was waiving "any and all" claims—not just those related to Zona—including claims arising out of gross negligence, willful misconduct, and even fraud on the investment adviser's part.

257.     This language also purported to relieve Arete Advisors of "any past, present or future duties," including an adviser's fiduciary duties to its clients.

**D.     Arete Clients Typically Signed the Releases in Return for $5,000 or Less in Compensation.**

258.     The amounts the Arete Representatives paid advisory clients to sign the releases ranged from $1, in the case of two of Randy Larson's clients, to $100,000, in the case of one of Jeff Larson's clients.

259.     In 91 of the approximately 103 releases signed by Arete customers and/or clients, including customers and clients of the Arete Representatives, the relevant Arete representative paid his client or customer $5,000 or less, an amount that generally was significantly lower than the amount the client or customer had invested in Zona stock.

260.     Chung collected and catalogued the Arete clients' and customers' executed releases to track how many of them signed the releases.

261.     During the tracking process, Chung learned that one of Randy Larson's clients had refused to sign the settlement agreement.

262.     Chung told Randy Larson that he did not need to continue to pursue that client's signature.

263.     By the end of September 2021, the Arete Representatives had paid approximately $650,000 in consideration to their customers and clients in exchange for their waiving claims relating to millions of dollars in purchases of Zona stock.

**IX.     Even After the Commission Staff Warned Him, Chung Failed to Implement Adequate Compliance Policies and Procedures for Arete Advisors for Years.**

264.     As Arete Advisors' CCO, Chung was responsible for the firm's compliance policies and procedures during the Relevant Period.

265.    The firm's compliance policies and procedures originated from an outside consulting firm.

266.    On November 26, 2018, the Commission's Division of Examinations ("Exams") issued a deficiency letter (the "Deficiency Letter") to Arete Advisors, addressed to Chung and Arete's CEO, and informed them that Arete Advisors' "Compliance Manual does not reflect many of Registrant's [Arete Advisors'] actual business practices with respect to its investment advisory business."

267.    In its Deficiency Letter, Exams notified Arete Advisors of Exams' conclusion that the firm had violated Advisers Act Rule 206-(4)(7)(a) by failing to adopt policies and procedures on topics such as "the purchase of alternative investments for its advisory clients, the factors considered, whether the purchase should be made in an advisory or brokerage account, and the disclosures made."

268.    The Deficiency Letter further found that "the various sections of the Compliance Manual have not been updated since June 4, 2012, or October 4, 2013. It appears that Registrant did not review the adequacy of its compliance policies and procedures annually."

269.    The Deficiency Letter notified Arete Advisors that Exams had concluded that the "Registrant's [Arete Advisors'] inadequate annual compliance reviews violate Rule 206(4)-7 under the Advisers Act and are inconsistent with the Compliance Manual. Registrant's failure to conduct adequate annual compliance reviews indicates a lack of diligence by management which impairs the effectiveness of Registrant's compliance program."

270.    On December 21, 2018, Chung wrote a response letter to Exams on behalf of Arete Advisors (the "Response Letter") and promised to add those topics to the compliance manual and to "revise [Arete Advisors'] Compliance Manual to reflect its actual business practices."

271.     In his Response Letter, Chung further represented to Exams that "Arete is in the process of reviewing and updating its Compliance manual, and will ensure it conducts annual reviews of its adequacy thereafter."

272.     Chung's Response Letter also promised that "Arete will further undertake to review the adequacy of its compliance policies and procedures annually."

273.     Chung's Response Letter further represented that "Arete is in the process of conducting a comprehensive review of its policies and procedures and will make all necessary amendments to its Compliance Manual to ensure that it is current and consistent with the Advisers Act."

274.     In subsequent years, Arete Advisors' senior director of compliance asked Chung multiple times to review and approve a new version of the compliance manual, to no avail.

275.     For example, in an October 20, 2020 email to Chung, nearly two years after Chung had sent the Response Letter to Exams, the senior director of compliance wrote to Chung and Arete's associate general counsel, "Just a reminder that we need to finish our RIA [registered investment adviser] WSPs [Procedures] so I can push them out to the field. Please let me know your comments when you have a moment."

276.     In April 2021, the senior director of compliance sent an email marked "High Importance" to Chung and Arete Advisors' associate general counsel and wrote:

> We are currently running our [registered investment adviser] on 2016 procedures. Please find the attached up to date version. There are notes and comments throughout that need to be addressed before this can be rolled out to the field. Please review this as soon as possible.

277.     The following year, on February 16, 2022, the senior director of compliance sent yet another email marked "High Importance" to Chung and Arete Advisors' associate general

counsel and wrote: "We need to address the Arete Wealth Advisors WSP's [Procedures] (noted copy attached). . . . Can we make time this week to address it?"

278.     Approximately one year later, on February 17, 2023, the Commission sent a subpoena to Arete Wealth and Arete Advisors in connection with its investigation into Zona requesting, among other things, documents sufficient to identify certain of Arete's policies and procedures.

279.     Between approximately December 2018 and May 2023, Arete Advisors and Chung did not conduct annual reviews of the adequacy of the firm's compliance policies and procedures and the effectiveness of its implementation.

280.     Between approximately December 2018 and May 2023, Arete Advisors and Chung failed to tailor the firm's compliance manual to accurately describe Arete's business or operations.

281.     Arete Advisors did not add the topics referenced in the Deficiency Letter to the firm's compliance manual and disseminate a revised manual to its employees until May 2023, approximately four and a half years after Chung had sent his Response Letter to Exams.

**X.     Arete Wealth Violated Recordkeeping Requirements,
and the Arete Representatives Aided and Abetted These Violations.**

282.     Despite the requirements of Exchange Act Rule 17a-4(b)(4) and the Arete Wealth Procedures, Arete personnel—including the firm's CEO and the Arete Representatives—used their personal phones to text about Arete Wealth's business in a practice that was widespread at the firm from at least January 2019.

283.     For example, Arete's CEO texted the Arete Representatives, Chung, and Arete's chief financial officer ("CFO") approximately 1,380 times between September 2018 and July 2023.

284.     Even after Arete received a July 10, 2020 document request from the Commission staff and a February 17, 2023 subpoena from the Commission staff, Arete's CEO continued to have an auto-delete function enabled on his personal phone until approximately May 2024, and Arete failed to retain any of his messages.

285.     Arete's CEO encouraged the use of texting over personal devices. When a new registered representative joined Arete, Arete's CEO used his personal phone to text the representative: "Text me with anything you need or anything you need fixed etc. You can text me or call me 24/7."

286.     Chung and Arete's CFO each included their personal cell phone numbers in their signature blocks on their work email accounts as late as March 2024.

287.     On many occasions beginning by at least 2019—just ten examples of which are described below—Arete Wealth personnel, including the Arete Representatives, sent and received text messages from their personal phones concerning Arete Wealth's broker-dealer business.

288.     On January 24, 2019, Miller exchanged texts with Arete's managing director of capital markets concerning a selling agreement for an investment to be offered to Arete customers.

289.     On November 10, 2020, Jeff Larson texted Miller concerning distributions from an investment sold to Arete customers, asking, "Do you anticipate any more [the investment's] MC Distributions this year?  If not, I'm going to start sweeping my cash accounts to [another investment] if the[y] are under 20k."

290.     On December 1, 2020, Jeff Larson texted Miller and a new Arete registered representative to introduce Miller to the new representative, wrote that she was "looking for 1m

of allocation" of an investment, and noted that "[s]he will rip [an investment offered to Arete customers], you'll get love."

291.    On December 8, 2020, Jeff Larson texted Arete's CEO and Randy Larson about the performance of a new Arete registered representative: "[The new registered representative] is billing on -25M and already has 1.25M of alt tickets in compliance review. She just started doing mtgs with her client and expects that number to grow. Before mtgs, she shows us the client and randy and I help her strategize the alternatives."

292.    Arete's CEO responded to the text with a thumbs-up emoji.

293.    On February 25, 2021, Miller texted Jeff Larson, Randy Larson, and two other Arete registered representatives about their fundraising efforts for an investment, wrote that there were "2 deals in 60 days selling in [fund] 15," and instructed the text participants to "[l]ook at your paycheck. You should have 2 backend checks on it[.]"

294.    On March 2, 2021, Miller and Jeff Larson exchanged texts discussing whether Arete had approved certain investments to offer to their customers.

295.    On March 27, 2021, Miller, Randy Larson, Jeff Larson, and another Arete registered representative exchanged texts concerning whether they would need help fundraising for an investment offered to Arete customers. Randy wrote, "[W]e have a ton coming but it takes about 6 weeks to get flow after we start reviesw . . . we just got to week 8 so steady flow is on now[.]"

296.    On March 31 and April 9, 2021, Jeff Larson texted a customer concerning the close of a deal and the quantity of funds to be distributed to the customer at closing.

297.    In testimony before the Commission staff, Jeff Larson stated that Arete had policies concerning text messaging, "[t]hat you can't text message."

298.    Arete Wealth did not retain or preserve most of the written communications concerning Arete's business that its personnel sent from their personal phones.

## TOLLING AGREEMENTS

299.    Arete and the SEC entered into tolling agreements and extensions suspending the running of any applicable statute of limitations from March 13, 2023, through September 13, 2023, from September 13, 2023, through March 13, 2024, from March 13, 2024, through September 13, 2024, and from September 13, 2024, through March 13, 2025.

300.    Miller and the SEC entered into tolling agreements and extensions suspending the running of any applicable statute of limitations from March 14, 2023, through September 14, 2023, from September 14, 2023, through March 14, 2024, from March 14, 2024, through September 14, 2024, and from September 14, 2024, through March 14, 2025.

301.    Jeff Larson and the SEC entered into tolling agreements and extensions suspecting the running of any applicable statute of limitations from March 23, 2023, through September 23, 2023, from September 23, 2023, through March 23, 2024, from March 23, 2024, through September 23, 2024, and from September 23, 2024, through March 23, 2025.

302.    Randy Larson and the SEC entered into tolling agreements and extensions suspending the running of any applicable statute of limitations from May 23, 2023, through September 1, 2023, from September 1, 2023, through March 1, 2024, from March 1, 2024, through September 1, 2024, and from September 1, 2024, through March 1, 2025.

303.    Chung and the SEC entered into tolling agreements and extensions suspending the running of any applicable statute of limitations from March 13, 2023, through September 13, 2023, from September 13, 2023, through March 13, 2024, and from March 13, 2024, through September 13, 2024.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Miller and Jeff Larson)

304.     The Commission realleges and incorporates by reference paragraphs 1 through 10, 16 through 43, 53 through 174, 176, 178, 180, 182 through 232, 299 through 303 as though fully set forth herein.

305.     Miller and Jeff Larson, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

306.     By reason of the foregoing, Miller and Jeff Larson, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Miller and Jeff Larson)

307.     The Commission realleges and incorporates by reference paragraphs 1 through 10, 15 through 43, 53 through 174, 176, 178, 180, 182 through 232, 299 through 303 as though fully set forth herein.

308.     Miller and Jeff Larson directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed a device, scheme

or artifice to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (3) knowingly or recklessly have engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon the purchaser.

309.    By reason of the foregoing, Miller and Jeff Larson, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
**Violations of Advisers Act Sections 206(1) and 206(2)**
**(Arete Advisors, Miller, Jeff Larson, and Randy Larson)**

310.    The Commission realleges and incorporates, as though fully set forth herein, paragraphs 1 through 13, 16 through 49, 69 through 174, 176, 178, 180, 182 through 251, 258 through 263, 299 through 303 as to Miller and Jeff Larson; paragraph 1 through 13, 16 through 49, 69 through 172, 175, 177, 179, 181, 182 through 251, 258 through 263, 299 through 303 as to Randy Larson; paragraphs 1 through 13, 16 through 49, 69 through 252, 258 through 263, 299 through 303 as to Arete Advisors' violations of Advisers Act Section 206(1); paragraphs 1 through 13, 16 through 49, 69 through 263, 299 through 303 as to Arete Advisors' violations of Advisers Act Section 206(2).

311.    Arete Advisors, Miller, Jeff Larson, and Randy Larson, directly or indirectly, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, have: (i) knowingly or recklessly employed devices, schemes, or artifices to defraud clients or prospective clients, and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

312.    By reason of the foregoing, Arete Advisors, Miller, Jeff Larson, and Randy Larson, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act Sections 206(1) and 206(2)
### (Miller, Jeff Larson, Randy Larson, and Chung)

313.    The Commission realleges and incorporates by reference paragraphs 1 through 13, 16 through 49, 69 through 174, 176, 178, 180, 182 through 251, 258 through 263, 299 through 303 as to Miller and Jeff Larson; paragraphs 1 through 13, 16 through 49, 69 through 172, 175, 177, 179, 181, 182 through 251, 258 through 263, 299 through 303 as to Randy Larson; 1 through 13, 16 through 49, 69 through 252, 258 through 263, 299 through 303 as to Chung as though fully set forth herein.

314.    Arete Advisors, Miller, Jeff Larson, and Randy Larson, directly or indirectly, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, have: (i) knowingly or recklessly employed devices, schemes, or artifices to defraud clients or prospective clients, and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

315.    By reason of the foregoing, Miller, Jeff Larson, and Randy Larson, directly or indirectly, singly or in concert, aided and abetted Arete Advisors' violations of Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b- 6(1) and 80b-6(2)] by knowingly or recklessly providing substantial assistance to Arete Advisors' violations, and Chung, directly or indirectly, singly or in concert, aided and abetted Arete Advisors', Miller's, Jeff Larson's, and/or Randy Larson's violations of Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b- 6(1) and 80b-

6(2)] by knowingly or recklessly providing substantial assistance to Arete Advisors', Miller's,

Jeff Larson's, and/or Randy Larsons' violations.

### FIFTH CLAIM FOR RELIEF
**Violations of Section 15(a) of the Exchange Act**
**(Miller, Randy Larson, and Jeff Larson)**

316.    The Commission realleges and incorporates by reference paragraphs 1 through

13, 15 through 43, 53 through 232, 299 through 303, as though fully set forth herein.

317.    Miller, Randy Larson, and Jeff Larson each acted as brokers within the meaning

of Section 3(a)(4) of the Exchange Act [15 U.S.C. §78c(4)] by directly or indirectly, by the use

of the mails or the means of instrumentalities of interstate commerce, effecting transactions in, or

inducing or attempting to induce the purchase or sale of, Zona stock.

318.    Miller, Randy Larson, and Jeff Larson were not registered with the Commission

in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)], and their association

with Arete Wealth did not exempt them from registration for the transactions at issue as such

transactions were not made in the scope or course of their employment with Arete Wealth.

319.    By reason of the conduct described above, Miller, Randy Larson, and Jeff Larson,

directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section

15(a) [15 U.S.C. § 78o(a)].

### SIXTH CLAIM FOR RELIEF
**Violations of Advisers Act Section 206(4) and Rule 206(4)-7 Thereunder**
**(Arete Advisors)**

320.    The Commission realleges and incorporates by reference paragraphs 14, 16

through 22, 24, 28, 50 through 52, 264 through 281, 299 through 303 as though fully set

forth herein.

321.    From approximately November 2018 to May 2023, Arete Advisors failed to adopt

written policies and procedures reasonably designed to prevent Advisers Act violations by the

firm and its supervised persons and failed to conduct its required annual review of the adequacy of its policies and procedures and the effectiveness of their implementation.

322. By reason of the foregoing, Arete Advisors, directly or indirectly, violated and unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

## SEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Advisers Act
### Section 206(4) and Rule 206(4)-7 Thereunder
### (Chung)

323. The Commission realleges and incorporates by reference paragraphs 14, 16 through 22, 24, 28, 50 through 52, 264 through 281 as though fully set forth herein.

324. From approximately November 2018 to May 2023, Arete Advisors failed to adopt written policies and procedures reasonably designed to prevent Advisers Act violations by the firm and its supervised persons and failed to conduct its required annual review of the adequacy of its policies and procedures and the effectiveness of their implementation.

325. By reason of the foregoing, Chung, directly or indirectly, singly or in concert, aided and abetted Arete Advisors' violations of 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7] by knowingly or recklessly providing substantial assistance to Arete Advisors' violations.

## EIGHTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 17(a) and Rule 17a-4(b)(4) Thereunder
### (Arete Wealth)

326. The Commission realleges and incorporates by reference paragraphs 14, 16 through 23, 25 through 28, 53 through 68, 282 through 298, 299 through 303 as though fully set forth herein.

327.    From approximately January 1, 2019 through May 2024, Arete Wealth failed to preserve, for a period of not less than three years, originals of all communications received and copies of all communications sent (and any approvals thereof) relating to its business as such.

328.    By reason of the foregoing, Arete Wealth violated directly or indirectly, and unless enjoined, will again violate Exchange Act Section 17(a) [15 U.S.C 78q(a)] and Rule 17a-4(b)(4) [17 C.F.R. § 240.17a-4(b)(4)] thereunder.

**NINTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act**
**Section 17(a) and Rule 17a-4(b)(4) Thereunder**
**(Miller, Jeff Larson, and Randy Larson)**

329.    The Commission realleges and incorporates by reference paragraphs 14, 16 through 23, 25 through 28, 53 through 68, 282 through 298, 299 through 303 as though fully set forth herein.

330.    From approximately January 1, 2019 through May 2024, Arete Wealth failed to preserve, for a period of not less than three years, originals of all communications received and copies of all communications sent (and any approvals thereof) relating to its business as such.

331.    By reason of the foregoing, Miller, Jeff Larson, and Randy Larson, directly or indirectly, singly or in concert, aided and abetted Arete Wealth's violations of Exchange Act Section 17(a) [15 U.S.C 78q(a)] and Rule 17a-4(b)(4) [17 C.F.R. § 240.17a-4(b)(4)] by knowingly or recklessly providing substantial assistance to Arete Wealth's violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the

following relief:

**I.**

Permanently enjoining Arete Advisors and its officers, agents, servants, employees and

attorneys and all persons in active concert or participation with any of them from violating,

directly or indirectly, Advisers Act Sections 206(1), 206(2), and 206(4), and Rule 206(4)-7

thereunder [17 C.F.R. § 275.206(4)-7)];

**II.**

Permanently enjoining Arete Wealth and its officers, agents, servants, employees and

attorneys and all persons in active concert or participation with any of them from violating,

directly or indirectly, Exchange Act Section 17(a) [15 U.S.C. § 78q(a)] and Rule 17a-4(b)(4)

thereunder [17 C.F.R. § 240.17a-4-(b)(4)];

**III.**

Permanently enjoining Miller and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Exchange Act Sections 15(a) and 10(b) [15 U.S.C §§ 78o(a) and 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 275.10b-5]; Securities Act Section 17(a) [15 U.S.C. § 77q(a)]; and

Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; and Exchange

Act Section 17(a) [15 U.S.C. § 78q(a)] and Rule 17a-4 thereunder [17 C.F.R. § 240.17a-4];

**IV.**

Permanently enjoining Jeff Larson and his agents, servants, employees and attorneys and

all persons in active concert or participation with any of them from violating, directly or

indirectly, Exchange Act Sections 15(a) and 10(b) [15 U.S.C §§ 78o(a) and 78j(b)] and Rule

10b-5 thereunder [17 C.F.R. § 275.10b-5]; Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; and Exchange

Act Section 17(a) [15 U.S.C. § 78q(a)] and Rule 17a-4 thereunder [17 C.F.R. § 240.17a-4];

**V.**

Permanently enjoining Randy Larson and his agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or

indirectly, Exchange Act Section 15(a) [15 U.S.C. § 78o(a)], Advisers Act Sections 206(1) and

206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and Exchange Act Section 17(a) [15 U.S.C.

§ 78q(a)] and Rule 17a-4 thereunder [17 C.F.R. § 240.17a-4];

**VI.**

Permanently enjoining Chung and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly

Advisers Act Sections 206(1), 206(2), and 206(4) [15 U.S.C. § 80b-6(1), 80b-6(2), and 80b-

6(4)], and Rule 206(4)-7 thereunder [17 C.F.R. §§ 275.206(4)-7)];

**VII.**

Permanently prohibiting Miller, Jeff Larson, and Randy Larson from, directly or

indirectly, acting as or being associated with any broker, dealer, or investment adviser, pursuant

to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5)]. This injunction shall not prevent the

Arete Representatives from being a customer or client of a broker, dealer, or investment

adviser. For purposes of this requested injunction, (a) a person is associated with a broker or

dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or

occupies a similar status or performs similar functions), directly or indirectly controls, is

controlled by, or is under common control with such broker or dealer, or is an employee of such

broker or dealer; and (b) a person is associated with an investment adviser if such person is a

partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser;

## VIII.

Permanently prohibiting Miller, Jeff Larson, and Randy Larson from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

## IX.

Permanently prohibiting Miller and Jeff Larson from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## X.

Permanently prohibiting Randy Larson from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

## XI.

Ordering Defendants to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

## XII.

Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

Dated: January 17, 2025

Respectfully submitted,

By: /s/ Eric M. Phillips
U.S. SECURITIES AND EXCHANGE
COMMISSION
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398
Email: phillipse@sec.gov

Oren Gleich*
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Telephone: (212) 336-0190
Facsimile: (212) 336-1319
Email: gleichor@sec.gov

* *Pro hac vice* application forthcoming