UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Securities and Exchange Commission,

    *Plaintiff,*

v.

Arete Wealth Management, LLC, *et al.*,

    *Defendants.*

No. 25 CV 616

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Arete Wealth Management, LLC ("AWM") is a Chicago-based company, registered with the Securities and Exchange Commission ("SEC") as a broker-dealer since August 1998. [Dkt. 61, ¶ 23.] Arete Wealth Advisors, LLC ("AWA"), also based in Chicago, has been registered as an investment adviser since January 2009. [*Id.*, ¶ 24.] From October 2018 to May 2020, Arete Representatives Joey Miller, Jeffrey Larson, and Randy Larson allegedly solicited investors to purchase stock in Zona Energy, Inc. ("Zona"). [*Id.*, ¶ 1.] They did so without Arete's approval and not subject to its compliance oversight. [*Id.*] Zona, however, was a purported sham, and in April 2021 was the subject of criminal and civil charges for misappropriating investor funds for luxury expenses. [*Id.*, ¶ 8.]

Before the court are four motions to dismiss, filed on behalf of six defendants (AWM, AWA, Miller, Jeff and Randy Larson, and Arete CCO UnBo "Bob" Chung), detailing objections to nine claims raised by the SEC under the Exchange, Securities, and Advisers Acts. [Dkts. 68, 70, 72, 74.] These include allegations of fraud in connection with Zona solicitations and subsequent attempts to settle liability, as well as alleged violations of registration, compliance, and recordkeeping regulations. For the following reasons, nearly all claims survive.

## I. Background[1]

### A. Arete Representatives Promote Zona, Receive Discounted Stock

The Zona scheme began in early 2018. [*Id.*, ¶ 70.] Convicted felon Richard Sterritt and friend Christopher Pittman sought to raise funds for Zona, and that spring engaged Pittman's friend, Michael Sealy, to identify additional investors. [*Id.*,

---

[1]    The following factual allegations are taken from the SEC's first amended complaint and are accepted as true for the purposes of the motions. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. See *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

¶¶ 5, 32, 77–78.] In October 2018, Sealy pitched Miller, a business acquaintance, who in turn pitched colleague Jeff Larson, who in turn pitched colleague and brother Randy Larson. [*Id.*, ¶¶ 80–81.] Eventually, Miller and the Larsons (together, "the Representatives") had invested in Zona, which was selling for $1 per share. [*Id.*, ¶ 82.] In accordance with firm procedures, Miller notified Arete of the personal investment, though he indicated that he "derived no compensation," nor did it "involve any Arete customers as part of the business or as potential customers of the business." [*Id.*, ¶ 84.] The Larsons provided no such notice. [*Id.*, ¶ 85.]

However, by early 2019, Miller and Jeff Larson agreed with Sterritt—who they knew under the alias "Richard Richman"—to solicit investors for Zona in exchange for discounted shares of Zona stock. [*Id.*, ¶¶ 88–89.] Randy Larson also agreed to raise capital. [*Id.*, ¶ 90.] From late 2018 to early 2019, Miller and Jeff Larson texted with Sterritt about this arrangement. [*Id.*, ¶ 91.] On December 18, 2018, Sterritt texted Jeff Larson that he "felt good after meeting you and your associates," and that he "think[s] we can work out a very mutually beneficial relationship." [*Id.*, ¶ 92.] Larson agreed, expressing that "[w]e are very intrigued and would love to get this off the ground." [*Id.*, ¶ 93.]

By January, Miller and Jeff Larson were raising capital. On January 9, 2019, Larson confirmed with Sterritt the sale price at $2.50 a share. [*Id.*, ¶ 94.] He then followed up, requesting that Sterritt "hold 2M total" for him and Miller, promising to each "get in 1m." [*Id.*, ¶ 95.] The next day, Miller texted Sterritt that he had already raised $1.12 million and expressed that he hadn't "even scratched the surface," and the day after promised "another million in the next day or 2. I'm just having a lot of people dip their toe in." [*Id.*, ¶¶ 96, 98.] Then, on January 14, Larson texted Sterritt that he "ha[s] my 1.25m lined up, chat soon." [*Id.*, ¶ 105.]

During this period, Miller texted Sterritt about the roles he envisioned for himself and Jeff Larson: "We want to be the 2 guys you send in the field to talk to your clients who have interest and we'll lock them In and be your voice so you can focus on the company and not have to mess with capital." [*Id.*, ¶ 99.] Sterritt responded: "You guys keep up the good work and I assure you I am a fair man," later adding, "And generous!!" [*Id.*, ¶¶ 100, 102.] Miller replied that he would "never ask for a handout" and would "prove a great partner over time." [*Id.*, ¶ 101.]

The Representatives—including Randy Larson—did not sell shares directly, or through Arete. [*Id.*, ¶ 122.] Instead, they connected investors to Zona employee Katie Mathews, who provided the necessary paperwork and accepted payment. [*Id.*] These investors included Arete's advisory clients, with whom they "discussed Zona during routine investment meetings," alongside Arete-approved investments. [*Id.*, ¶ 121.] Throughout, Mathews kept records matching each investor to the representative who solicited them, and clarified among the three when it was unclear who deserved credit for an investment. [*Id.*, ¶¶ 154–163.]

In time, the Representatives raised more than half of the total amount of money Zona secured from investors. [*Id.*, ¶ 113.] Among the client interactions that led to investments, which occurred during telephone calls or in-person meetings:

- Jeff Larson expressed, "I think [Zona] goes public around June at over $10/share. I think in 2 years it can be at 35-50/share and has legs to go over 100/share." [*Id.*, ¶ 119.]
- Miller promised to "go to bat" for one investor to get them in at a discounted $1 per share. [*Id.*, ¶ 136.]
- Randy Larson informed one client when liquidated money would be available in his account to invest with Zona. [*Id.*, ¶¶ 146–47.]
- Jeff Larson informed one client that, "with his net worth, he may want to consider [investing] more" than just $100,000. [*Id.*, ¶ 148.]
- Randy Larson advised a client on how to complete forms, telling her "to say that she was an 'individual subscriber' but that, if she used cash, she should list her husband as a 'co investor.'" [*Id.*, ¶ 152.]

They also "followed up with investors to ensure that they had completed work Mathews sent them and had sent in their money." [*Id.*, ¶¶ 165–67]

While investors paid $2.50 per share, Miller and Jeff Larson purchased shares at a significant discount. [*Id.*, ¶ 107.] Miller purchased 830,000 shares across eleven transactions, nine of which at a price of $1 per share. [*Id.*, ¶ 115.] He also purchased 80,000 shares at $0.50 per share in May 2019, and 250,000 shares for just $0.04 per share in February 2020. [*Id.*] Jeff Larson (and his spouse) purchased nearly 930,000 shares across eight installments—four at $1.00 per share, two at $0.50 per share, one at $2.50 per share, and the final 250,000 for $0.04 per share. [*Id.*, ¶ 116.]

This, the complaint alleges, was pursuant to agreement. [*Id.*, ¶ 114.] In July 2019, Zona insiders emailed about "[n]eeding agreement with Michael Sealy, Joey Miller, Jeff Larson for continued selling activities for future partnerships. There is no agreement other than verbal bull[expletive] with regard to their participation ($10,000)." [*Id.*, ¶ 109.] Neither Miller nor Jeff Larson, though, disclosed any agreement—verbal or otherwise—to the investors they pitched, and who then invested. [*Id.*, ¶ 198.] Instead, as discussed more thoroughly *infra* Part III.A.1, they communicated that they did not receive compensation, pay, commission, or benefits— and were recommending Zona only as a friend. [*Id.*, ¶ 179.]

## B. The Representatives Attempt to Conceal Activities from Arete

While engaging with both Zona personnel and investors, the Representatives sought to avoid discussing Zona on email accounts associated with Arete. [*Id.*, ¶ 168.] In January 2019, Miller texted Sterritt "to be careful as we don't wany any comment of this on our security emails." [*Id.*, ¶ 169.] Jeff Larson, meanwhile, asked Mathews

3

to "please [] NOT email any of us at [Wealth Management Firm] about Zona," to which Mathews replied that she was "aware [she is] not to send [him] and Joey [Miller] emails at work." [*Id.*, ¶¶ 170–71.]

All three, at some point, also directed clients to discuss Zona away from their work email accounts. On March 18, 2019, Randy Larson emailed two of his Zona clients from his Arete account that he was "[e]mailing now about Z from a different account." [*Id.*, ¶ 172.] Days later, upon receiving a client email referencing Zona, Miller responded, "I don't know what ZONA IS!! [] Call me on that one plz." [*Id.*, ¶ 173.] And in April, Jeff Larson told one client with whom he discussed Zona that he "need[s] to email this opportunity away from [his] work email." [*Id.*, ¶¶ 174, 180–81 (subsequently discussing Zona with same client).]

But Chung, Arete's chief compliance officer and general counsel, still discovered the Representatives' activities. In September 2019, during an on-site FINRA examination of the Larsons' branch office, an examiner provided Chung with a copy of Jeff Larson's email to the above-mentioned client. [*Id.*, ¶ 199.] That same month, the Larsons each submitted outside activity forms to Arete, in which they expressed that their roles with Arete were that of an "[i]nvestor" or "[s]tockholder," that their involvement began in April 2019, and that they neither involved Arete customers nor held duties or responsibilities with Zona. [*Id.*, ¶¶ 200–07.] Miller had previously disclosed the same. [*Id.*, ¶¶ 84–85.]

By November, Chung notified each representative that their forms were inaccurate. [*Id.*, ¶ 213.] His letters to each expressed that:

> You had previously verbally informed me about your intention to personally invest in Zona stock but you were instructed not to introduce this security to any Arete clients since this oil and gas investment was so speculative…. FINRA rules do not permit the recommendation of securities away from the firm.

[*Id.*, ¶ 214.] He told Jeff Larson that, despite this, "FINRA has detected an April 17, 2019 email you sent to one of your clients, [the] Camp, via your personal email account where you appeared to have recommended an unapproved security product called Zona." [*Id.*, ¶ 217.] To Miller and Randy Larson, he wrote that he "concluded that [they] discussed the investment with [] close, longtime friends who are also clients of the firm." [*Id.*, ¶¶ 215, 219.]

However, Chung told Miller that he "understand[s] that [he] did not receive any remuneration of any sort," Jeff Larson that he "concluded that [he] genuinely intended to perform a charitable act by introducing the stock to [his] client and that [he] in no way stood to gain any financial gain by doing so," and Randy Larson that he "understand[s] that [he] discussed Zona with [his] friends in casual social settings

when they prompted [him] to discuss [his] personal investments." [*Id.*, ¶¶ 215, 217, 219.] This, despite the Representatives having already solicited at least fifty, thirty, and fifteen clients, respectively. [*Id.*, ¶¶ 216, 218, 220.]

Chung placed all three on heightened supervision, assessing heightened supervision fees "designed to provide [Arete] with a very thin cushion should we be dragged into an arbitration." [*Id.*, ¶¶ 213, 221.] Though the measures could include "a daily review of activity, frequent contact with customers by the supervisor, pre-approval of all communications, and attendance in an outside training program," Chung imposed only the training program and by December had removed Miller's heightened supervision. [*Id.*, ¶¶ 222–24.] Miller, by phone, had convinced Chung that he "did not introduce the investment to any investor and any of [his] clients who ultimately decided to invest did so based on knowledge obtained from sources other than [him]." [*Id.*, ¶ 224.]

### C.    Zona is Exposed as a Fraud

On or around January 19, 2020, the Arete Representatives received an anonymous email notifying them that "Richard Richman" was, in fact, Sterritt. [*Id.*, ¶ 225.] It accused Sterritt of "business catfishing" through Zona by creating a fake identity to defraud victims. [*Id.*] Jeff Larson called Sterritt that day to warn of "inevitable ensuing investor alarm." [*Id.*, ¶ 226.] Larson advised him to "get ahead" of the allegations and to "fight fire with fire" by issuing press releases, making statements, distinguishing Zona from prior dealings, and having someone credible vouch for Zona. [*Id.*, ¶¶ 228–29.] He also cautioned against anyone forwarding the email to his "completely regulated" work email account. [*Id.*, ¶ 231.]

Still, Chung received a copy of the email on January 27. [*Id.*, ¶ 232.] He reported it to an SEC staff member, observing that Zona appeared to be a fraud but withholding that the Representatives had engaged investors and were consequently placed on heightened supervision. [*Id.*, ¶¶ 233–34.]

Despite the email, Miller and Jeff Larson continued to secure investments. At least thirty-one previous investors re-invested between February and May 2020, with Zona—now ERF after a one-to-one exchange—selling at $1.00 per share. [*Id.*, ¶¶ 235, 237, 239–241.] During this window, all three Representatives also purchased 250,000 shares at $0.04 per share. [*Id.*, ¶ 236.]

But a year later, on April 14, 2021, the SEC filed a complaint in the Eastern District of New York, charging Sterritt and six others with defrauding investors and market manipulation in connection with Zona.[2] [*Id.*, ¶ 247.] The complaint referenced the Representatives, though not by name:

---

[2]    The U.S. Attorney's Office for the Eastern District of New York also filed an indictment, charging five including Sterritt. [*Id.*, ¶ 250.]

> Sterritt and Pittman became acquainted with three dually-registered investment adviser individuals/registered representatives at a dually-registered investment adviser/broker-dealer firm, and, in exchange for their commitment to raise at least $3 million, allowed the representatives to buy Zona shares for as little as $0.04/share, compared with the $1.00/share or $2.50/share price typically offered to other investors.

[*Id.*, ¶ 259.]

A FINRA Representative, who had days earlier requested from Chung a list of Arete customers who the firm believed invested in Zona, then asked Chung to confirm which Arete representatives were involved with Zona. [*Id.*, ¶¶ 246, 251.] In response, after cross-referencing Zona investors with Arete clientele, Chung provided FINRA a list of 150 Arete clients that had invested in Zona. [*Id.*, ¶¶ 252, 254, 259.] Approximately sixty were Miller's, forty were Jeff Larson's, and twenty were Randy Larson's. [*Id.*, ¶¶ 255–57.] None were notified. [*Id.*, ¶ 258.]

### D. Chung Oversees the Representatives' to Obtain Liability Waivers

In late April 2021, Arete's CEO convened a conference call with the Representatives, their individual counsel, Chung, and other members of management. [*Id.*, ¶ 263.] He chastised the Representatives for involving Arete clients and demanded that they hire and pay outside counsel to draft—and to have their clients sign—settlement agreements releasing Arete from liability. [*Id.*, ¶¶ 264–65.] The CEO delegated oversight to Chung, who thereafter worked with the Representatives' individual counsel in shaping the releases. [*Id.*, ¶¶ 268, 272.] Specifically, he sent at least eleven emails on the subject of the releases, received approvals on drafts, and instructed the Representatives "to include a clause in each Release claiming that the Arete customer or client had not made his or her Zona investment through the recommendation of an Arete representative," and to pay clients out of pocket for signing them. [*Id.*, ¶¶ 269–274.]

The agreements, to which the client and relevant representative were the only parties, *id.*, ¶ 278, stated that the "INVESTOR learned of the existence of Zona Energy, Inc. from [representative], and INVESTOR understood that [representative] was not recommending an investment in Zona Energy, Inc. nor was [representative] acting as a financial adviser to INVESTOR" regarding Zona.[3] [Dkt. 73-2, at 2.[4]] Miller

---

[3]    Though not quoted in its entirety by the complaint, the full agreement is incorporated by reference, and so the court may consider it as part of the pleadings. *See Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018).

[4]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

and Jeff Larson's releases also stated that "INVESTOR is also aware that [representative] purchased some shares in Zona at a price per share less than INVESTOR paid, however, INVESTOR did not consider or ask what [representative] paid in making the decision to purchase." [Dkt. 61, ¶ 281.] They did not mention that Miller and Larson received those discounted shares in return for soliciting investments. [*Id.*, ¶ 282.]

The releases also contained broad language purporting to waive "any and all" claims against both the Representatives *and* Arete, and releasing them from "any past, present or future duties"—including and beyond those relating to Zona. [*Id.*, ¶¶ 285–88.]

Chung tracked, collected, and catalogued the releases, signed by both client and representative. [*Id.*, ¶¶ 279, 291–92.] By September 2021, the Representatives had paid approximately $650,000 to clients to sign the releases—in individual amounts ranging from $1 to $100,000. [*Id.*, ¶¶ 289, 294.] Ninety-one of the approximately 103 clients who signed received $5,000 or less, an amount often lower than the investment in Zona. [*Id.*, ¶ 209.]

### E. Arete Fails to Revise its Compliance Manual and Fosters a Culture of Recordkeeping Non-Compliance

The alleged fraud happened against the backdrop of Arete's own alleged non-compliance with securities regulations.

In November 2018, Chung—who as chief compliance officer was responsible for the firm's compliance—received a deficiency letter from the SEC, informing him and Arete's CEO that their "inadequate policies and procedures violate Rule 206(4)-7 under the Advisers Act." [*Id.*, ¶¶ 295, 297.] Among other deficiencies, the letter observed that Arete's Compliance Manual "does not address how outside business activities ("OBAs") of Registrant's employees are approved and monitored by the Chief Compliance Officer or management." [*Id.*, ¶¶ 298–300.] It also noted that "the various sections of the Compliance Manual have not been updated since June 4, 2012, or October 4, 2013," and advised them to "promptly conduct a comprehensive review of its policies and procedures and make all necessary amendments to ensure that the Compliance Manual is current and consistent with the Advisers Act." [*Id.*, ¶¶ 301–03.] The Act, through the Compliance Rule promulgated thereunder, requires annual reviews of "policies and procedures reasonably designed to prevent" fraud. 17 C.F.R. § 275.206(4)–7.

Chung responded in December, promising revisions and representing that Arete was "in the process of reviewing and updating its Compliance manual, and will ensure it conducts annual reviews of its adequacy thereafter." [Dkt. 61, ¶¶ 304–07 (also promising that "Arete will further undertake to review the adequacy of its

compliance policies and procedures annually.")] But Arete made no changes for four-plus years. [*Id.*, ¶¶ 314–15.]

Meanwhile, in 2020, 2021, and 2022, Arete's senior director of compliance sent draft revisions for Chung's review. [*Id.*, ¶¶ 308–11.] For example, on one occasion, Chung and Arete's associate general counsel received an email marked 'high importance,' which said,

> We are currently running our [registered investment adviser] on 2016 procedures. Please find the attached up to date version. There are notes and comments throughout that need to be addressed before this can be rolled out to the field. Please review this as soon as possible.

[*Id.*, ¶ 310.] A revised manual, however, was not disseminated until May 2023. [*Id.*, ¶¶ 314–15.]

Also during this time, "a culture where Arete personnel texted about Arete business matters" persisted even though Arete had policies against text messaging. [*Id.*, ¶¶ 316–17, 339.] Among the text messages sent among personnel, and between personnel and clients, were discussions of investments, approvals, fundraising, and client engagement. [*Id.*, ¶¶ 324–338.] Further, these communications were not retained—despite SEC rules requiring the retention of broker-dealer business communications, and Arete policies purporting to require the same. [*Id.*, ¶¶ 60–68.]

## II.    Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's claims. To survive a motion to dismiss under Rule 12(b)(6), "a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the court takes well-pleaded factual allegations as true, conclusory allegations are insufficient to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    Analysis

Defendants seek to dismiss all nine claims, arguing that the SEC failed to state plausible claims for fraud and noncompliance under the Exchange, Securities, and Advisers Acts. The claims cover a sweeping array of conduct, most notably allegedly fraudulent representations and omissions to investors by Miller and Jeff Larson relating to the undisclosed agreement to recruit investors in exchange for discounted shares. These activities give rise to plausible violations of Section 10(b) of the Exchange Act, Section 17(a) of the Securities Act, and Section 206 of the Advisers Act. Further, the unregistered selling of Zona stock by all three Representatives plausibly violated the Exchange Act's registration requirement.

Also allegedly fraudulent, the three Representatives—with Chung, on behalf of AWA—asked investors to sign settlement agreements containing false representations. These representations could not have possibly deceived the investors, who were capable of parsing the truth themselves, so they cannot support a claim under the Advisers Act. But because the agreements also purported to waive "any and all" duties, including Arete's unwaivable fiduciary duties, they were plausibly misleading—sufficiently so that the SEC properly alleged an Advisers Act claim against AWA.[5]

Finally, the complaint sufficiently pleads that AWA failed to maintain its compliance procedures, and that AWM failed to retain off-channel communications— in violation of the Advisers Act and Exchange Act, respectively. It also plausibly alleges that Chung and the Representatives, respectively, aided and abetted these violations.

### A.    Exchange Act and Securities Act Violations

The first two claims, concerning Miller and Jeff Larson's alleged fraud, arise under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act. [Dkt. 61, ¶¶ 348–49, 352–53] The SEC also alleges that Miller and both Larsons further violated the Exchange Act by acting as unregistered brokers. [*Id.*, ¶¶ 367–68.]

#### 1.    Exchange Act Section 10(b) Fraud

Section 10(b) makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, adopted pursuant to the SEC's Section 10(b) rulemaking authority, makes it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5.

To prove a violation, the SEC must therefore establish that Miller and Jeff Larson "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Bauer*, 723 F.3d 758, 768–69 (7th Cir. 2013) (internal citation and quotation marks omitted). Material omissions include only "half-truths, not pure omissions"—i.e., "when a speaker says

---

[5]    Though the court refers to Arete more generally, it distinguishes between the two entities—AWA and AWM—when a claim concerns only one.

nothing, in circumstances that do not give any particular meaning to that silence." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). Scienter, meanwhile, contemplates an "intent to deceive, manipulate, or defraud," or a "reckless disregard of the truth." *Id.*; *S.E.C. v. Lyttle,* 538 F.3d 601, 603 (7th Cir. 2008) ("defendants either knew that the representations they made to investors were false or were reckless in disregarding a substantial risk that they were false"). Finally, the in-connection-with language requires only a misrepresentation "coinciding" with or "touching" a securities transaction. *United States v. Durham*, 766 F.3d 672, 682 (7th Cir. 2014) (cleaned up) (citing *S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002) and *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12 (1971)).

Here, the SEC alleges (1) that Miller and Jeff Larson misrepresented that they "would not benefit from the investors' purchases of Zona stock," (2) that Jeff Larson falsely told investors "Arete was aware that he was promoting Zona stock," and (3) that both violated Section 10(b) and Rule 10b–5 by "hiding their sales of Zona shares from Arete, in part, by using off-channel communications."[6] [Dkt. 98, ¶ 348.]

Regarding its first theory of misrepresentation, the SEC argues that Miller and Jeff Larson made "false and misleading statements (and related material omissions) to certain individuals to whom they recommended Zona stock to hide the fact that they were receiving compensation from Zona for making those recommendations (i.e., their discounted Zona shares)." [Dkt. 80, at 32.] Put differently, they had agreed with Zona to recommend its stock in return for discounted shares—a material fact they either misrepresented or omitted in their communications with investors.

The Representatives' objections are manifold. Beyond the representations themselves, they argue (1) that the complaint refers to them "selling" Zona stock, "but there are no allegations in the FAC that either of them sold Zona stock," and (2) that the underlying "agreement (which was apparently not reduced to writing) is too vague on its face to have been enforced," and otherwise alleged in insufficient detail. [Dkt. 75, at 13, 17–19.] As to the representations themselves, they add (3) that the complaint fails to plead them with particularity, (4) that the alleged representations are either too ambiguous or too vague to be false, and (5) that pure omissions, like those alleged, are not actionable. [*Id.*, at 14–16, 19–20.]

The court cannot agree that the Rule 10b–5 violation fails on account of the SEC's mention of "sales" or its allegations as to the underlying agreement. First, one

---

[6]     The Representatives argue that "allegations of fraud regarding the 2021 releases" fail because "[p]ost-investment conduct is not covered by Section 10(b) and Rule 10b-6." [Dkt. 75, at 20–21.] But, as the SEC responds, its 10(b) claim does not mention the releases, which are relevant only to the alleged violations of the Advisers Act. [Dkt. 80, at 36 n.3. *See also* Dkt. 61, ¶¶ 357–58, 362–64.]

need not sell securities in a literal sense to violate the Rule, since its in-connection-with language is to be construed broadly and "merely requir[es] 'a misrepresentation 'coinciding' with or 'touching' a securities transaction.'" *Durham*, 766 F.3d at 682 (cleaned up) (citing *Zandford*, 535 U.S. at 822 and *Bankers Life,* 404 U.S. at 12). The SEC alleges that Miller and Jeff Larson recommended Zona stock to investors who then invested, and that is enough.

Second, though the Representatives argue that the "supposed 'agreement' … cannot legally serve as a foundation on which to impose … an obligation to speak about it to third parties," it cites no direct support, and the court disagrees with the premise. [Dkt. 75, at 17.] Notwithstanding an agreement's enforceability, its disclosure could well be necessary "to ensure that statements already made are clear and complete." *Macquarie*, 601 U.S. at 264 (observing that 10b–5's duty of disclosure exists to cure misleading statements, not as an affirmative mandate). In other words, representations as to Miller and Jeff Larson's motive for promotion—or their lack of compensation—may be misleading if an agreement did exist, enforceable or not. To that end, though the Representatives cite for support an email describing the then-agreement "for [Miller and Larson's] continued selling activities" as "verbal bull[expletive]," the cited quote does the opposite—establishing that an agreement, unknown to investors, existed in some form.[7] [Dkt. 75, at 17 (citing Dkt. 61, ¶ 109).]

Nor is the court persuaded by the Representatives' entwined arguments as to specificity—that the allegations are not pled with particularity, and that the alleged misrepresentations are ambiguous and vague.

Plaintiffs bringing Section 10(b) claims must plead the alleged fraud with the particularity demanded by Federal Rule of Civil Procedure 9(b). *Walleye Trading LLC v. AbbVie Inc.*, 962 F.3d 975, 977 (7th Cir. 2020). Ordinarily, this includes the "who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal citation and quotation marks omitted). However, the Seventh Circuit has warned repeatedly against "'erroneously tak[ing] an overly rigid view of the formulation,'" observing that "the precise details that must be included in a complaint 'may vary on the facts of a given case.'" *Id.* (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442

---

[7]      In this respect, the circumstances differ from *W.E.B. Production & Fabricating, Inc. v. Insurance Co. of the West*, 2024 WL 4723747 (N.D. Ill. Nov. 8, 2024), the "illustrative case" that the Representatives reason is analogous. [Dkt. 75, at 19.] There, the plaintiff's theory of fraud concerned the defendant's undisclosed use of a "Pretextual Method" to calculate insurance premiums. *W.E.B. Production*, 2024 WL 4723747, at *4. However, the court held that the complaint failed to plead with particularity that the defendant *used* such a method. *Id.* Not so here, where the complaint alleges—through a dated, attributed, and quoted email—both the existence of a verbal agreement and a party's desire to memorialize it. [Dkt. 61, ¶ 109.]

(7th Cir. 2011). Even so, "plaintiffs must 'use some ... means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Id.* (quoting 2 James Wm. Moore et al., Moore's Federal Practice § 9.03[1][b], at 9-22 (3d ed. 2015)). Guiding this inquiry is the question of fair notice—"the most basic consideration underlying Rule 9(b)." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (internal citation and quotation marks omitted).

For both Miller and Jeff Larson, then, the SEC has substantiated its allegations with sufficient precision. For example, against the backdrop of the alleged agreement for discounted shares, the complaint writes its quintessential newspaper lede with allegations that, in April 2019, Larson emailed a specific client that he received "no benefit from" recommending Zona, and that he was "getting no pay for making the connection… so no benefit to me." [Dkt. 61, ¶¶ 180–81.] Perhaps a half-step down, the allegation that, at a quarterly meeting, Miller advised client K.B. that he was 'recommending Zona as a friend' provides the who, what, where, and how—and though it does not specify a precise date, it notes that K.B. purchased Zona stock on May 30, 2019, establishing a basis for approximation. [*Id.*, ¶¶ 183–84.] This is so, particularly because the complaint also identifies the recipient of the alleged misrepresentation,[8] further substantiating each allegation. Indeed, every alleged misrepresentation includes, at minimum, the individual speaker, recipient, date of purchase, and discrete quoted or paraphrased statement—which, together, provide ample notice for the Representatives to prepare their defense. [*See id.*, ¶¶ 180–98.] The Representatives' critique of the complaint's particularity therefore falls flat.

The court also disagrees that the alleged misrepresentations are appropriately described as vague optimism or personal opinions about stock prices, or are otherwise too vague to prove truth or falsity. [*See* Dkt. 75, at 13, 15 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175 (2015); *City of Taylor Police and Fire Ret. Sys. v. Zebra Technologies Corp.*, 8 F.4th 592, 595 (7th Cir. 2021); *Seeks v. Boeing Co.*, 752 F.Supp.3d 992, 1016–17 (N.D. Ill. 2024).] The relevant statements—as quoted or paraphrased—concern the Representatives' motivations for promoting Zona stock; they mention receiving "no benefit," dkt. 61, ¶ 180, "getting no pay," *id.*, ¶ 181 "recommending Zona as a friend," *id.*, ¶ 183, "not making any money," *id.*, ¶ 185, "not receiving a commission," *id.*, ¶ 187, "never [being] compensated," *id.*, ¶ 189, "currently [himself] purchasing Zona at [full price]," *id.*, ¶ 192, and "bringing it to the investor's attention as a friend," *id.*, ¶ 196. Given that Miller and Jeff Larson allegedly received discounted shares in return for promotion, these representations appear plausibly contradictory on their face—or, if splitting hairs over the difference between pay/money/compensation, and discounted shares—plausibly misleading.

---

[8]     The aforementioned 'who' refers to the "identity of the person making the misrepresentation." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014).

To that end, the Representatives next argue that any failure to disclose the agreement is a "pure omission," and therefore not actionable after *Macquarie*, 601 U.S. 257. But the alleged omissions are more akin to the half-truths that Rule 10b–5 covers. Like the "classic example of … the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property," the alleged omissions here are accompanied by the foregoing "affirmative assertions." *Id.* at 263 (quoting *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)). In light of these alleged representations as to compensation and motivation, Miller and Jeff Larson's receipt of discounted shares—even if not per se payment or commission—is relevant, qualifying information. Indeed, one may otherwise understand from the representations that Miller and Larson received no benefit whatsoever.

The failure to disclose, then, is necessarily different from "when a speaker says *nothing*, in circumstances that do not give any particular meaning to that silence." *Macquarie*, 601 U.S. at 263 (emphasis added) (describing the "simplest example" of a pure omission as when a "company fails entirely to file an MD&A" and so "the omission of particular information required in the MD&A has no special significance because no information was disclosed"). Here, the Representatives cannot possibly contend that *nothing* was said, since the SEC alleges omissions only in the context of actual conversations with investors. [Dkt. 61, ¶ 348.] Because it's plausible that these affirmative statements were misleading without disclosing the agreement, the Representatives' *Macquarie* argument fails.

Therefore, whether as misrepresentations or omissions, the SEC has pled—with particularity—that Miller and Jeff Larson's statements plausibly violate Section 10(b) and Rule 10b–5, in light of the alleged agreement for discounted shares.

The SEC's second theory of misrepresentation—that Jeff Larson falsely told investors "Arete was aware that he was promoting Zona stock,"—survives, too. [Dkt. 61, ¶ 348.] The complaint alleges he told both J.W. (in April 2019) and D.Y. (before D.Y.'s April 2019 purchase) that Arete was aware he was promoting Zona stock, providing ample substantiation and notice. [*Id.*, ¶ 191, 194.] While the Representatives suggest these representations are true, consistent with the complaint's allegation that "Jeff Larson disclosed his Zona activity to Arete in September of 2019," *see* dkt. 75 at 16, the actual allegation is that Larson disclosed *only* his investment activity, *not* any promotional activities. [*Id.*, ¶¶ 204, 206 (quoting Larson as writing "I have no duties, just invested personal money into the opportunity").] And while the Representatives argue that it's "significant" that "Jeff Larson is alleged to have said different things to everyone mentioned," i.e., did not couple his statement as to Arete's knowledge with one regarding his motivations, the court does not see why. [Dkt. 75, at 13–14, 15–16.] Each is plausibly false or misleading on its own.

The SEC's third theory, however, is underdeveloped. It states only that "Miller and Jeff Larson further violated Exchange Act Section 10(b) and Rule 10b-5 thereunder by hiding their sales of Zona shares from Arete, in part, by using off-channel communications." [Dkt. 61, ¶ 348.] Is it alleging that they committed fraud against the company? If so, the theory—even if plausible—veers into pure-omission territory if predicated on them "hiding their sales," as opposed to submitting false disclosures. The Representatives take greater issue with the allegation's mention of "sales," which—as discussed above—is not persuasive given the in-connection-with language's broad reach. [*See* Dkt. 75, at 22.] Still, the court shares the general sentiment that the circumstances of this claim are unclear, particularly against the heightened pleading standard.

Regardless, the SEC has identified plausible, material misrepresentations or omissions. With scienter not in dispute and the representations clearly coinciding with securities transactions, the SEC has sufficiently alleged Section 10(b) violations against both Miller and Jeff Larson.

## 2.    Securities Act Section 17(a) Fraud

The elements of Section 10(b) and Section 17(a) violations are substantially the same, except the latter "applies to a broader range of conduct, including to offers or sales of securities … and to negligent conduct (as opposed to § 10(b)'s scienter requirement)." *U.S. Sec. & Exch. Comm'n v. Henderson*, 2022 WL 3135015, at *8 (N.D. Ill. Mar. 17, 2022). Here, the parties agree that the claims are identical in all relevant respects, *see* dkt. 75 at 23; dkt. 80 at 31, so the second claim survives, too.

## 3.    Exchange Act Section 15(a) Registration Requirement

Section 15(a) of the Exchange Act establishes a registration requirement for brokers, who it defines as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). The requirement "is of the utmost importance in effecting the purposes of the Act because it enables the SEC to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records." *S.E.C. v. Benger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (internal citation and quotation marks omitted).

When, as here, the only question is whether defendants are appropriately considered "brokers," courts in this district have asked "whether the individual may be characterized by 'a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *Id.* (quoting *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y.2003). *Benger* highlighted a non-exhaustive list of factors ("the *Hansen* factors") to consider, including whether a defendant:

1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors.

*Id.* (quoting *SEC v. Hansen,* 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984); *United States Sec. & Exch. Comm'n v. River N. Equity LLC*, 415 F. Supp. 3d 853, 860 n.2 (N.D. Ill. 2019). Ultimately, though, the fundamental question is whether the defendant simply "facilitated the consummation of the sales." *River N. Equity*, 415 F. Supp. 3d at 860; *United States Sec. & Exch. Comm'n v. Battoo*, 158 F. Supp. 3d 676, 695 (N.D. Ill. 2016).

The SEC argues that its "FAC is replete with allegations that courts have considered sufficient to demonstrate broker activity," and this court agrees. Considering the *Hansen* factors in turn: first, there is no question that the Arete Representatives were not Zona employees. [*See* Dkt. 62, ¶¶ 24–27.] Second, Miller and Jeff Larson's receipt of discounted shares of Zona stock are, to the extent the SEC alleges it was conditioned on successfully soliciting investments, functionally equivalent to receiving commission—at least as it necessarily distinguishes them from salaried employees. [*Id.*, ¶¶ 89, 91, 114–17.] In particular, an alleged conversation between Sterritt and Miller—in which the former says that if they "keep up the good work" then he assures them that he is "a fair man"—plausibly conveys that he rewarded them *for* their continued, successful activities. [*Id.*, ¶¶ 100–102.] Third, there is no dispute that the Representatives regularly sell other issuers' securities. [*See id.*, ¶¶ 24–27; Dkt. 89, at 8 (not disputing the third factor).]

Fourth, as to involvement in negotiations, the complaint recounts a conversation between Miller and an investor, in which the former promises to "go to bat" with Zona to secure a lower share price. [Dkt. 61, ¶ 136.] Related, the complaint also describes Jeff and Randy Larson's involvement in processing documents, which courts in this district have identified as similarly relevant to the analysis. *See Battoo*, 158 F. Supp. 3d at 695. For example, Jeff Larson emailed Mathew to provide "proper titling" for paperwork, and to request "the name of [a client's] trust to prepare the paperwork." [Dkt. 61, ¶¶ 141–42.] Randy Larson, meanwhile, advised at least one client on how to complete the required forms and helped ensure that "[his] people fill[ed] out suitability [forms] and sign[ed] sub docs." [*Id.*, ¶¶ 152, 167.] In short, all three plausibly involved themselves as intermediaries—in some capacity—beyond the initial solicitation.

Fifth, the complaint quotes Jeff Larson's email to an advisory client, stating that he "think[s Zona] goes public around June at over $10/share. I think in 2 years it can be at 35-50/share and has legs go over 100/share." [*Id.*, ¶ 119.] These concrete predictions—not only as to the stock's upward trajectory, but also its timeline for

going public—are so specific that his characterization of them as so "vague that they cannot reasonably be construed as 'mak[ing] valuations as to the merits of the investment or giv[ing] advice'" falls especially flat. [Dkt. 89, at 9.] Larson is also quoted as having told an investor that, based on his net worth, "he may want to consider [investing] more." [Dkt. 61, ¶ 148.] At least for him, then, the complaint plausibly alleges that he provided valuations and advice.

Sixth, as to the question of active solicitation, the complaint describes the following:

- Jeff Larson's text to Sterritt, in which he promises that he and Miller will each raise $1 million. [*Id.*, ¶ 95.] Miller then texted Sterritt the next day, boasting that he already raised more than $1 million without "even scratch[ing] the surface," and later that he was "having a lot of people dip their toe in." [*Id.*, ¶¶ 96, 98. *See also id.*, ¶ 104 (Miller states that Jeff Larson "can raise as much as me").]
- Miller's text to Sterritt, in which he declares that he and Jeff Larson "want to be the 2 guys you send in the field to talk to your clients who have interest and we'll lock them In and be your voice." [*Id.*, ¶ 99.]
- Jeff Larson's email to an advisory client pitching Zona. [*Id.*, ¶ 119.]
- An investor email, stating that Randy Larson "encouraged [them] to connect with [Mathews] regarding Zona investments." [*Id.*, ¶ 129.] An investor also emailed Mathews upon Randy Larson informing them that "the $2.50/share price is still being offered to some investors." [*Id.*, ¶ 133.]
- Jeff Larson's text to Sterritt, in which he admits to telling an investor that, based on his net worth, he may want to purchase more than the originally-committed $100,000. [*Id.*, ¶ 148.]
- Spreadsheets matching various investors to Miller and Jeff Larson. [*Id.*, ¶¶ 157–58.]
- Text messages among the three Representatives discussing "who to credit" for a particular client's investment. [*Id.*, ¶¶ 160–63] Notably, Randy Larson allegedly "responded with names of possible investors whom he had solicited." [*Id.*; ¶ 162.]
- Emails from Jeff and Randy Larson promising to "get on the phone and make some things happen" or to "track down [my people]—in the context of outstanding investor tasks. [*Id.*, ¶¶ 166–67.]
- Settlement agreements acknowledging that investors "learned of the existence" of Zona from the Representatives. [Dkt. 73-2, at 2.]

Thus, the complaint alleges each representative's active role in soliciting investors and their money.

On balance, these alleged activities plausibly portray the Representatives facilitating the sale of Zona's securities. Their argument to the contrary—that, at most, the complaint alleges only that "the defendants brought together the parties to a transaction"—is unavailing given detailed allegations as to their ongoing roles in soliciting and consummating investments. [Dkt. 75, at 28.]

Nor is it dispositive that "[t]here are no allegations of fact that any defendant mailed promotional materials or analyzed Zona's financial status," as was relevant in *SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 291 (E.D.N.Y. 2020), or that the complaint does not allege "any such role in preparing or distributing any marketing materials," as in *SEC v. Navellier & Assocs., Inc.*, 2020 WL 731611, at *7 (D. Mass. Feb. 13, 2020), aff'd, 108 F.4th 19 (1st Cir. 2024). To reach its conclusion, the court need not find each *Hansen* factor satisfied—indeed, "the presence of even a single factor may be enough"—nor must it find that the Representatives engaged in every activity that previously informed a court's decision. *See River N. Equity*, 415 F. Supp. 3d at 857. The determinative question is whether the complaint plausibly alleges that "the alleged broker 'facilitated the consummation of [securities] sales,'" and here it has. *Battoo*, 158 F. Supp. 3d at 695 (quoting *Benger*, 697 F. Supp. 2d at 945).

Finally, Randy Larson—who is not alleged to have been compensated with discounted shares of Zona stock—argues separately that, per FINRA Rule 3270 and the Exchange Act's definition of broker, to be under the Act's purview, "the individual recommending the stock, or 'selling' the stock must be compensated." [Dkt. 87, at 10.] This is incorrect. The Rule requires notice to one's member firm when compensated for outside activities, *see* FINRA Rule 3270 (2015), but does not itself establish the Exchange Act's parameters. The Act, meanwhile, is silent as to compensation, defining "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." § 78c. And again, while compensation is a relevant consideration, no single *Hansen* factor is controlling. *See Sec. & Exch. Comm'n v. Laura*, 680 F. Supp. 3d 204, 232 (E.D.N.Y. 2023) (observing that compensation "factor is [not] more important than any of the others").

Therefore, the SEC has plausibly alleged that Miller, Jeff Larson, and Randy Larson violated Section 15(a) of the Exchange Act.

## B. Advisers Act Violations

Claims III and IV raise two sets of claims under Section 206 of the Advisers Act. First, alleging three distinct violations of Sections 206(1) and/or 206(2), it reasons that the settlement agreements, obtained as the Zona scheme was exposed, contained deceptive omissions, representations, and waivers. [Dkt. 61, ¶¶ 356–58.] AWA and the Representatives, it says, are responsible for these violations—with the Representatives and Chung having aided and abetted in varying capacities. [*Id.*, ¶¶ 362–64.] Second, it alleges that AWA, with Chung again aiding and abetting,

17

violated Section 206(4) by failing to maintain up-to-date compliance procedures. [*Id.*, ¶¶ 371, 375.]

### 1.    Advisers Act Sections 206(1) and 206(2) Fraud

Both claims arise under Sections 206(1) and 206(2) of the Advisers Act. These are "similar to, though broader than, Sections 17(a) of the Securities Act and Section 10(b) of the Exchange Act, as they prohibit investment advisers from (1) using the mails or other instruments of interstate commerce to employ any device, scheme or artifice to defraud any client or prospective client; and (2) engaging in *any* transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *S.E.C. v. Householder*, WL 1466812, at *6 (N.D. Ill. July 8, 2002). *See* 15 U.S.C §§ 80b–6 (2010). This breadth "reflects the fiduciary nature of the relationship between the investment adviser and client," imposing affirmative duties and obligations of good faith, full and fair disclosure, and using reasonable care to avoid misleading clients. *Householder*, WL 1466812, at *6 (citing *SEC v. Blavin*, 760 F.2d 706, 711–12 (6th Cir. 1986). Scienter is required for claims brought under Section 206(1), though not Section 206(2). *Sec. & Exch. Comm'n v. Caine*, 2024 WL 4382751, at *5 n.6 (N.D. Ill. Oct. 3, 2024).

Here, the SEC identifies several violations, each implicating—either directly or for aiding and abetting—a distinct set of defendants. First, as with its Section 17(a) and Section 10(b) claims, the SEC alleges that Miller and Jeff Larson violated Sections 206(1) and 206(2) by "failing to disclose that they received discounted shares in return for raising money for Zona." [Dkt. 61, ¶ 356.] Second, it alleges that the Representatives and AWA violated the provisions by "obtaining liability releases from their advisory clients containing false information." [*Id.*, ¶ 357.] Third, it alleges that AWA violated Section 206(2) by impermissibly obtaining from these clients waivers of "any and all" claims. [*Id.*, ¶ 358.] Chung, it says, aided and abetted the second and third violations, and the Representatives are alleged to have aided and abetted AWA's violation of the second. [*Id.*, ¶¶ 362–64.]

### a.    Failure to Disclose Discounted Shares

The SEC makes two arguments relating to Miller and Jeff Larson's receipt of discounted shares. As with before, it maintains that the as-discussed "false and/or misleading statements and material omissions" amount to fraud. [*Id.*, ¶ 356; Dkt. 80 at 41.] Separately, it observes that, because Section 206 imposes affirmative duties of disclosure, additional non-disclosures-by-pure-omission are also actionable. [Dkt. 61, ¶ 356 ("failing to disclose … [is a] breach of their fiduciary duty to disclose any conflicts of interest); Dkt. 80 at 40–41.] *See also United States v. Bloom*, 846 F.3d 243, 247 (7th Cir. 2017) (citing Supreme Court for rule that "investment adviser has 'an affirmative duty of utmost good faith, and full and fair disclosure of all material facts'").

The Representatives acknowledge that the first theory is identical to that discussed in Part III.A.1. As to the second, they insist that any difference in the law is irrelevant because "the FAC does not adequately allege the 'agreement' at issue. There can be no liability under any statute for failing to disclose an 'agreement' that has not been adequately alleged in the first place." [Dkt. 89, at 6.] But they cite no support, and as before, the court finds this argument unpersuasive. The duty here is a fiduciary one—not one contingent on an underlying agreement's enforceability. *See supra* Part III.A.1.

The Representatives' second objection—that they are not "investment advisors" with fiduciary relationships, as contemplated by the statute—is therefore more apposite, and a means by which these claims might be reasonably distinguished, at a threshold level, from the foregoing. [Dkt. 89 at 6.] But not so here.

As defined by the statute, the term "investment advisor" covers "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(11). Critically, "once a person meets that definition (by receiving compensation from any client to which it provides advice), the person is an adviser, and the Advisers Act applies to the relationship between the adviser and any of its clients (whether or not the adviser receives compensation from them." Investment Advisers Act Release No. 3222, 76 Fed. Reg. 39646, 39669 (July 6, 2011); *U.S. Sec. & Exch. Comm'n v. Amah*, 2023 WL 6386956, at \*18 (S.D.N.Y. Sept. 28, 2023).

It is therefore irrelevant whether "Miller and the Larsons were in fact 'investment advisers' for each of their clients who purchased Zona shares"—that is, whether they meet the statutory definition with regard to *each* client, in the context of *each* Zona interaction. [Dkt. 89, at 6.] The SEC alleges—and presumably no one disputes—that Arete "was in the business of providing investment advice to clients for compensation," and that the "Arete Representatives were … investment adviser representatives associated with Arete Advisors." [Dkt. 61, ¶¶ 44–45.] Having once met the definition, the Advisers Act applies to all subsequent client interactions, including those related to Zona.[9]

For this reason, Miller and Jeff Larson cannot distinguish this claim—as it pertains to their alleged misrepresentations, omissions, and non-disclosures while soliciting investors—from those discussed *supra* Part III.A.1.

---

[9]     It is therefore irrelevant that Randy Larson "is not alleged to have received any compensation in exchange for his recommendation of Zona stock," in light of the Act's compensation requirement. [Dkt. 87 at 4, 7.] The label carries from his pre-Zona activities, and necessarily so if it's to cover prospective—and not-yet paying—clients, too.

### b.      False Information in Liability Releases

The SEC next argues that the Representatives—as well as AWA, through the Representatives—all violated Sections 206(1) and 206(2) "by obtaining liability releases from their advisory clients containing false information." [Dkt. 61, ¶ 357.] Specifically, it argues that the following are false:

> WHEREAS INVESTOR learned of the existence of Zona Energy, Inc. from [Representative,] and INVESTOR understood that [Representative] was not recommending an investment in Zona Energy, Inc. shares in Zona Energy, Inc.; and

> WHEREAS INVESTOR is also aware that [Representative[10]] purchased approximately [number] shares for approximately [amount] in Zona at a price per share less than INVESTOR paid, however, INVESTOR did not consider or ask what [Representative] paid in making the decision to purchase;

[Dkt. 73-2, at 2; Dkt. 61, ¶ 357.]

The parties dispute a lot, particularly questions of who "made" these statements and whether the "maker" even matters. [Dkt. 73, at 11–12; Dkt. 75, at 21–22; Dkt. 80, at 44–46.] More fundamentally, though, these alleged violations are not so because the signatory investors could not have possibly been defrauded. The statements speak only to *their* prior understanding, awareness, and considerations—all of which are necessarily known to the respective investor. Therefore, even if untrue—i.e., even if the investor *did* believe the representative was recommending an investment, *did not* know that the representative purchased shares below market, and *did* ask about or weigh the representative's own purchases—the investor, upon receiving the release, would be entirely capable of parsing that on their own. It is axiomatic that one cannot be deceived when they know the truth. *See Teamsters Loc. 282 Pension Tr. Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir. 1985).

Here, where the violation concerns fiduciary duties and the "full and fair disclosure of all material facts," it's through the materiality element that this axiom is realized. [Dkt. 80, at 43.] Facts are material when disclosing them is substantially likely to alter the "total mix of information made available," and, here, an investor's knowledge of their own experience does not change merely because someone else asks them to remember it differently.[11] *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Sec. & Exch. Comm'n v. Commonwealth Equity Servs., LLC*, 133 F.4th

---

[10]      This latter provision was included only in agreements with Miller and Jeff Larson's clients. [Dkt. 61, ¶ 281.]

[11]      No factfinder could find differently, and so this is appropriately decided as a matter of law. *See TSC Indus.*, 426 U.S. at 451.

152, 168 (1st Cir. 2025) (analyzing Supreme Court precedent and applying the *TSC Indus.* materiality standard to Advisers Act violations).

More apt, then, is the SEC's allegation that, when sharing the releases and acknowledging they paid below-market prices for their shares in Zona, Miller and Jeff Larson violated the Advisers Act by omitting that they "received those shares in return for raising money for Zona." [Dkt. 61, ¶ 357.] But this does nothing to expand the claim.

Therefore, to the extent it purports to allege anything new or implicate additional defendants, this second alleged violation is without merit. And because no primary violation exists, neither Chung nor the Representatives can be liable as aiders and abettors. *See Monetta Fin. Servs., Inc. v. S.E.C.*, 390 F.3d 952, 956 (7th Cir. 2004).

### c.    Fiduciary Duty Waivers

Finally, the SEC alleges that AWA violated Section 206(2) by obtaining settlement agreements purporting to limit its liability, including by waiving its fiduciary duties to clients. [Dkt. 61, ¶ 358.] More specifically, the SEC reasons that the written releases—which are also identified by language, representative signatory, and key dates, *see id.* ¶¶ 268–71, 278–88, 294—may mislead investors into not exercising unwaivable legal rights, thereby operating as a fraud or deceit. This, it says, happened through Chung's oversight of releases, all of which include the following at-issue provision:

> Mutual Release. In consideration of the Parties' mutual desire to avoid litigation, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, INVESTOR, on the one hand, hereby releases [the relevant Arete representative], Arete Wealth Advisors, LLC, Arete Wealth Management, LLC, and each of their past, present and future agents, representatives, shareholders, members, managers, principals, attorneys, affiliates, parent corporations, subsidiaries, officers, directors, employees, predecessors and successors and heirs, executors and assigns*, from any and all legal, equitable or other claims*, counterclaims, demands, setoffs, defenses, contracts, accounts, suits, debts, agreements, actions, causes of action, sums of money, reckoning, damages, judgments, findings, controversies and disputes, *and any past, present or future duties, responsibilities, or obligations, whether known or unknown, including, but not limited to, those claims that may arise relating to Zona Energy, Inc.* Jeffrey Scott Larson, on the other hand, hereby release INVESTOR, his past, present and future agents, representatives, attorneys, heirs, executors and assigns, from any and all legal, equitable or other claims, counterclaims, demands, setoffs, defenses, contracts, accounts, suits, debts, agreements, actions, causes of action, sums of money, reckoning, damages, judgments, findings, controversies and disputes, and any

past, present or future duties, responsibilities, or obligations, whether known or unknown.

[Dkt. 61, ¶ 286; Dkt. 73-2, at 2–3 (emphasis added).]

Many of AWA and Chung's arguments emphasize that, as a matter of law, the agreement could not *actually* release AWA from its future fiduciary duties. For example, AWA argues it could not be bound, as a non-party, to the settlement agreement, and that its fiduciary duties are governed by advisory agreements that cannot be amended without AWA's signature. [Dkt. 73, at 16.] Chung, meanwhile, focuses on what he frames as a contradiction between his alleged knowledge that fiduciary duties *cannot* be waived and his reckless disregard of the fact that they *had* been waived. [Dkt. 69, at 7.] These miss the mark, since the theory of fraud is not that the fiduciary duties were waived, but that investors *believed* they were, and therefore misled into not exercising their legal rights.[12]

This, then, is not a question of waiver, but of deception. For this reason, the court is not persuaded by arguments that the clause did not *explicitly* waive fiduciary duties (or other specific types of claims and duties), given the all-encompassing breadth of the purported waiver. [Dkt. 69, at 16; Dkt. 73 at 17.] Nor does the court agree that "[n]o reasonable party" would interpret the agreements to release "an adviser that is not a party to the Settlement Agreement," whose fiduciary relationship is "governed by a completely separate advisory agreement not mentioned in the Settlement Agreement."[13] [Dkt. 73, at 18.] AWA is mentioned in both the agreement's preamble and mutual release. [Dkt. 73-2, at 2 ("wishes to release [representative] and the companies with which he is affiliated" and "releases [representative], Arete Wealth Advisors. LLC, Arete Wealth Management, LLC").] Given this language, it's plausible that investors believed the settlement agreements controlled their relationships with the affiliated companies.

---

[12] AWA argues that this theory should be rejected entirely, since publicly available information permits clients to know waiver of fiduciary duties is impossible. [Dkt. 73, at 19–20.] But this idea—that legal sophistication can be shifted to the client—is inconsistent with fundamental balance of trust and expertise in a fiduciary relationship. *See In re Tecfidera Antitrust Litig.*, 791 F. Supp. 3d 852, 871 (N.D. Ill. 2025).

[13] AWA's motion repeatedly references and quotes these advisory agreements. This includes mention of a savings clause, which even the SEC has identified as relevant to the deception inquiry. *See Priv. Fund Advisers; Documentation of Registered Inv. Adviser Compliance Revs.*, Release No. 6383 (Aug. 23, 2023). However, the complaint does not reference the advisory agreements, instead citing federal law and compliance manuals as the sources of AWA's fiduciary duties. [Dkt. 61, ¶¶ 49, 283.] It is well-settled in the Seventh Circuit that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *Mueller*, 880 F.3d at 895 (internal quotation marks and citation omitted). Therefore, the court will not consider the advisory agreements here, and it declines to take judicial notice of them based only on AWA's insistence that their accuracy and authenticity is beyond question.

Also unpersuasive is AWA's argument that a "plain reading" of the agreements shows it was "intended to address and resolve matters relating to Zona – and Zona only." [Dkt. 73, at 17.] Though the contract does mention extinguishing "potential liability *relating to the investment,*" the mutual release provision also explicitly covers claims "including, *but not limited to,* those claims that may arise relating to Zona Energy, Inc." [Dkt. 73-2, at 2 (emphasis added).] The latter is plausibly misleading.

Finally, the court cannot agree with AWA's due process argument—that the Commission has only ever applied this "hedge clause doctrine" to "forward-looking documents or agreements," i.e., advisory agreements, and not to "release[s] to settle existing potential claims arising from past activities would violate the Advisers Act." [Dkt. 73 at 21–22.] Here, the settlement agreements covered non-Zona matters, too, and purported to release AWA from all "past, present or *future* duties." [Dkt. 61, ¶ 358 (emphasis added).] This expansive and forward-reaching sweep renders the releases so similar to advisory agreements, at least insofar as a waiver would be problematic, that the court does not view the SEC's approach as a "brand-new opportunistic theory." [Dkt. 73, at 23.]

Because the SEC has identified a plausible theory of fraud, AWA's and Chung's respective liability turn on each's conduct and mental state. For AWA, as the primary alleged violator, its conduct must be at least negligent. *Sec. & Exch. Comm'n v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 775 (N.D. Ill. 2016) ("violation of the Advisers Act may be established by showing that a defendant 'should have' acted differently"). Chung's aiding and abetting liability, meanwhile, attaches if (1) there is "a primary violation; (2) the aider and abettor generally was aware or knew that his or her actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted the primary violation." *Monetta*, 390 F.3d at 956.

The alleged conduct is the same: Chung, delegated oversight of the releases by Arete's CEO, was then responsible for reviewing them and "took an active role in shaping "the[ir] contents." [Dkt. 61, ¶¶ 266–72.] And because, "as general counsel and CCO for a registered Commission broker-dealer and investment adviser," he should have known that "federal securities laws prohibit investment advisers from contracting to waive the fiduciary duties that they owe their clients," a reasonable person in his position would not have included the hedge clause and risked deceiving the clients. [Dkt. 61, ¶¶ 283–84.] This, imputed to his employer, is enough to plead AWA's negligence and, therefore, a primary violation.

For Chung's aiding and abetting liability, though, negligence doesn't suffice. At minimum, the SEC must allege recklessness. *See, e.g., Nutmeg*, 162 F. Supp. 3d at 783 (but noting "it remains an open question whether recklessness is [even] enough under the law of this circuit for aiding and abetting liability" under the Advisers Act).

The SEC, however, pleads only that he "knew or at least recklessly or *negligently disregarded this prohibition*" against waivers, and it says nothing about his knowledge or awareness that such a waiver might be improper or illegal as a theory of deception. [Dkt. 61, ¶ 284 (emphasis added).] Informed of this shortcoming, it argues that the complaint *does* allege recklessness but points the court to an unrelated allegation. [Dkt. 80, at 48 (citing Dkt. 61, ¶ 375).] This does not suffice.

Therefore, the SEC has raised a plausible Section 206(2) violation against AWA. The claim for Chung's derivative liability, however, fails.

## 2. Advisers Act Section 206(4) Non-Compliance

Section 206(4), like Section 206(2), forbids advisers from "engag[ing] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." § 80b–6(4). It also permits the SEC to "define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." *Id.* One such rule requires advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation," and to review them annually. 17 C.F.R. § 275.206(4)–7. The SEC alleges that AWA—again through Chung, and with Chung aiding and abetting—failed to maintain and review such policies, thereby violating Section 206(4) and this Compliance Rule promulgated thereunder. [Dkt. 61, ¶¶ 371–72, 374–75.]

### a. AWA's Primary Violation

AWA insists, as an initial matter, that the claim must fail because these failures are not themselves fraudulent, deceptive, or manipulative. [Dkt. 73, at 24; Dkt. 84, at 17–18 ("operational or administrative lapses [] do not as a matter of law rise to the level of manipulation, fraud or deception").] This misunderstands the law. As held by both the Seventh Circuit and Supreme Court in a parallel Exchange Act context, "[t]he power to define and prescribe means 'reasonably designed to prevent' fraudulent, deceptive, or manipulative, acts and practices must extend further than the mere proscription of acts and practices that are in fact fraudulent, deceptive, or manipulative; otherwise this language is superfluous." *S.E.C. v. Maio*, 51 F.3d 623, 635 (7th Cir. 1995); *United States v. O'Hagan*, 521 U.S. 642, 673 (1997) ("Commission may prohibit acts not themselves fraudulent under the common law or § 10(b), if the prohibition is 'reasonably designed to prevent ... acts and practices [that] are fraudulent'"). This is no less true under the Advisers Act. *See, e.g.*, *Sec. & Exch. Comm'n v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 959 (C.D. Cal. 2022) (observing that advisers can violate the Compliance Rule "independent of any other securities law violation").[14]

---

[14]  For this reason, the court finds irrelevant AWA's argument that "selling away is a broker-dealer, not investment advisory activity," and thus disconnected from the Representatives' fraud. [Dkt. 73, at 25.]

Therefore, the SEC must plead that AWA "(1) failed to adopt adequate written compliance policies and procedures and (2) did so at least negligently." *Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 286, 303 (E.D. Pa. 2021) (citing *S.E.C. v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992)). It has done so, alleging that, despite receiving notice in November 2018 that AWA's existing policies violated the Advisers Act, AWA—through Chung—failed to address any deficiencies between December 2018 and May 2023. [Dkt. 61, ¶¶ 297, 312–315.] And not only does it allege that the SEC notified Chung, for example, that AWA's procedures "do[] not address how outside business activities … are approved and monitored by the Chief Compliance Officer or management," or that "various sections of the Compliance Manual have not been updated,"—but also that AWA personnel pressed Chung, unsuccessfully, to update its procedures in October 2020, April 2021, and February 2022. [*Id.*, ¶¶ 300–01, 309–1.] This, despite Chung having promised the SEC in December 2018 that it was "in the process of reviewing and updating its Compliance manual, and will ensure it conducts annual reviews of its adequacy thereafter." [*Id.*, ¶ 305.] Therefore, AWA failed to bring itself into compliance despite notice, both externally and internally, that its policies and procedures were outdated.

AWA argues that this renders Rule 206(4)–7 "a strict liability rule for any operational or technical compliance shortcoming," which "cannot possibly be the correct interpretation under federal securities law." [Dkt. 84, at 18.] Not so. Negligence is required, at minimum, and the SEC's cited support acknowledges that such lapses can be "innocent or otherwise non-culpable." *Criterion*, 599 F. Supp. 3d at 959. But that's not what's alleged here, where Chung is said to have known AWA's manual was deficient, promised to remedy its shortcomings, and failed to do so for four-plus years. Through Chung, then, AWA plausibly violated the Compliance Rule—and therefore Section 206(4), too.[15]

### b.    Chung's 'Aiding and Abetting' Liability

Emphasizing the same conduct, the SEC alleges that Chung aided and abetted AWA's violation of the Compliance Rule. Again, this requires that (1) there was "a primary violation; (2) the aider and abettor generally was aware or knew that his or her actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted the primary violation." *Monetta*, 390 F.3d at 956.

As an initial matter, though, Chung challenges the SEC's "confusion about— or intentional muddling of—the difference between primary and aiding and abetting liability under the Investment Advisers Act." [Dkt. 83, at 14–15.] Parsing this

---

[15]    AWA requested that this claim be severed if it is the only remaining claim against it. Because Claim III against it also survives, the court denies this motion to sever without prejudice.

argument, he seems to reason that, because he is not an investment adviser, he cannot be held liable for a primary violation of the Advisers Act—and thus the SEC erred in focusing its claim against AWA on his actions, and then holding him secondarily liable for aiding and abetting. The court, however, finds this approach neither confusing nor incorrect.

Entities "can act only through the actions of natural persons," and so it is hardly erroneous for the SEC to predicate its claim against AWA on the actions of an officer. *S.E.C. v. Koenig*, 2007 WL 1074901, at *7 (N.D. Ill. Apr. 5, 2007); *Sec. & Exch. Comm'n v. City of Victorville,* 2017 WL 11679413, at *49 (C.D. Cal. June 2, 2017) ("Claims against entities are always predicated on the actions of individuals. Thus, entities … can only 'act' only through their officers, employees or other agents.") And because AWA is an investment adviser, it is irrelevant that Chung—who the SEC does not attempt to hold liable for the primary violation—is not. But one need not be an investment adviser to aid and abet one. *See, e.g.*, *Sec. & Exch. Comm'n v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 772, 786 (N.D. Ill. 2016); *Sec. & Exch. Comm'n v. Colangelo*, 2018 WL 2327663, at *1 (W.D.N.Y. May 23, 2018) ("investment advisers are not the only ones prohibited from such conduct—those who aid and abet a violation are equally liable"). Nor is it wrong to pursue derivative liability against an employee whose actions violate the act, if the primary violation is imputed to their employer. *See Koenig*, 2007 WL 1074901, at *6–7; *City of Victorville,* 2017 WL 11679413, at *48–49; *U.S. S.E.C. v. Brown*, 878 F. Supp. 2d 109, 117 (D.D.C. 2012).

The same conduct that determines the underlying violation, then, can also establish Chung's aiding and abetting liability. So, having properly alleged that, through Chung's conduct, AWA violated the Compliance Rule, the SEC has pled both a primary violation and his substantial assistance. Liability therefore turns on whether he knew inaction was improper or illegal, and given his engagement with the deficiency letter—which explained that AWA's "inadequate policies and procedures violate Rule 206(4)-7 under the Advisers Act"—the court concludes he did. [Dkt. 61, ¶ 297.]

Chung makes several arguments to the contrary, most of which suffer the same mistake: presuming this court cannot conclude that he, as chief compliance officer, bore responsibility for AWA's compliance. First, he argues that, because the at-issue policies and procedures did not originate with him, because a senior director of compliance took efforts to revise them, and because he himself took no action, he cannot be liable. [Dkt. 69, at 25.] But the complaint clearly alleges that, despite revisions being shared internally, his review was sought "before [they could] be rolled out to the field."[16] [Dkt. 61, ¶¶ 308–311.] As pled, then, his inaction is plausibly the

---

[16]    Quoting the complaint, Chung states that the senior director of compliance told him that she was "'finish[ing]' the firm's "RIA [registered investment adviser] WSPs [Procedures],' after which she intended to 'push them out to the field.'" [Dkt. 69, at 26.] But

proximate reason the deficiencies went uncorrected, not evidence of his lack of responsibility.

Next, he argues that "nowhere … does the Commission allege that Mr. Chung was aware of any primary violator's failure to carry out those tasks." [Dkt. 69, at 27.] Nor, he says, would "mere 'awareness and approval' of Arete Wealth Advisors' purported failure to review and update its policies and procedures sufficient to allege substantial assistance on Mr. Chung's part." [*Id.*, at 28.] But, as alleged, AWA's failure *was* Chung's failure. His conduct—and knowledge of its impropriety—caused the primary violation.

Chung makes one final argument that strikes this court as borderline frivolous. He argues that the complaint—insofar as it describes internal personnel discussing revisions that were never implemented—shows "the steps Arete Wealth Advisors and Mr. Chung took in 2020, 2021 and 2022 to review and update Arete Wealth Advisors' policies and procedures [and therefore] directly refute[s]" allegations of inaction. [Dkt. 69, at 27.] But as the SEC responds, to require only conversation without implementation "would transform the annual review requirement into a meaningless exercise." [Dkt. 80, at 62.] It cannot be so.

Therefore, having alleged (1) a primary Section 206(4) violation, (2) owing to Chung's conduct, (3) against the backdrop of an unequivocal deficiency letter to which he responded, the SEC has sufficiently alleged the elements for aiding and abetting liability. The derivative claim survives, too.

## C. Recordkeeping Violations

Finally, the SEC alleges that—by failing to preserve text messages concerning its broker-dealer business—AWM violated Exchange Act Section 17(a) and Rule 17a–4(b)(4) thereunder, and that the Representatives aided and abetted the violation. [Dkt. 61, ¶ 377.] The Rule requires AWM to preserve "[o]riginals of all communications received and copies of all communications sent (and any approvals

---

this twists the quote, which says instead that the director wrote that "*we need to* finish our RIA … *so* I can push them out to the field. Please let me know your comments when you have a moment." [Dkt. 61, ¶ 309 (emphasis added).] The same is true when Chung argues that the director told him "she had created an 'up to date version' of Arete's '[registered investment adviser] . . . procedures' which she said she would eventually 'roll[] out to the field.'" [Dkt. 69, at 26.] Rather, she wrote that "[t]here *are notes and comments throughout that need to be addressed before* this can be rolled out to the field." [Dkt. 61, ¶ 310 (emphasis added).] Selective omission is a "cardinal sin" and both "unethical and sanctionable," and the court warns against doing so again. *McDonald v. City of Chicago*, 2011 WL 13755, at *1 (N.D. Ill. Jan. 3, 2011); *C & F Packing Co. v. Doskocil Companies, Inc.*, 126 F.R.D. 662, 687 (N.D. Ill. 1989).

thereof) by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such." 17 C.F.R. § 240.17a–4(b)(4).[17]

To support its claim, the SEC emphasizes that "Arete's CEO texted the Arete Representatives, Chung, and Arete's chief financial officer ("CFO") approximately 1,380 times between September 2018 and July 2023," none of which were retained. [Dkt. 61, ¶¶ 318–19.] More specifically, it references conversations between the Representatives and each other, clients, or other Arete personnel that it says "concern[ed] Arete Wealth's broker-dealer business." [*Id.*, ¶¶ 324–337.]

AWM makes both constitutional and merits-based arguments in response. It insists that the Rule deprives AWM of due process "because neither Congress nor the SEC has ever defined these rules in a manner that would allow market participants to comply with their obligations," and that the Rule is otherwise unconstitutionally vague as applied to text messages. [Dkt. 71, at 8, 21.] It also endorses a narrow interpretation of the Rule, which it says does not cover the conduct alleged. [*Id.*, at 15, 18.]

First, as to the Rule's constitutionality, AWM raises—and blends—vagueness and fair-notice concerns. It observes that statutes violate due process if "so vague that men of common intelligence must necessarily guess as its meaning and differ as to its application." [*Id.*, at 8 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). And it emphasizes that, in the context of administrative agencies, interpretations may not be retroactively adopted "without first informing those subject to the obligations." [*Id.* (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012).] Then, challenging as vague the phrase, "business as such," it says the lack of "meaningful guidance" permits arbitrary enforcement and creates confusion. [*Id.*, at 9, 11.] It also argues that "persons of at least ordinary intelligence [would] not understand" it to apply to off-channel communications, i.e. text messages, and that the violations therefore "stem from novel, arbitrary, and discriminatory enforcement rather than from explicit or clear legal standards." [*Id.*, at 21.]

"The void for vagueness doctrine rests on the basic principle of due process that a law is unconstitutional if its prohibitions are not clearly defined." *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 519 (7th Cir. 2010). But due process requires neither "perfect clarity" nor "precise guidance," and "statute[s] need not define every term to survive a vagueness challenge." *Sec. & Exch. Comm'n v. Lupo Sec. LLC*, 2023 WL

---

[17]     AWM does not allege or otherwise challenge any requisite mental state, though the court notes that others have concluded that "[s]cienter need not be shown to prove a violation of section 17(a)(1) of the Exchange Act and the rules thereunder." *S.E.C. v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 610 (S.D.N.Y. 1993), *aff'd sub nom. S.E.C. v. Posner*, 16 F.3d 520 (2d Cir. 1994) (citing *Stead v. SEC*, 444 F.2d 713, 716–17 (10th Cir. 1971). To that end, the court understands the SEC's discussion of Arete's top-down culture of off-channel messaging as establishing a basis for its negligence.

130476, at *7 (N.D. Ill. Jan. 9, 2023) (quoting *Sherman*, 623 F.3d at 501 and *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016). The test is also "less strict" when involving "civil rather than criminal penalties," and when concerning "economic regulation[s] … because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Ultimately, courts will invalidate a statute as unconstitutionally vague if it "1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or 2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006).

Due process also requires fair notice. *Lupo*, 2023 WL 130476, at *8. In determining whether parties receive fair notice of prohibited or required conduct, courts look to "regulations and other agency guidance." *Id.* (quoting *Wis. Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700, 708 (7th Cir. 2013)). Fundamentally, the question is whether the defendant "was likely 'able to identify, with ascertainable certainty, the standards with which the agency expected it to conform.'" *See id.*, at *8 (quoting *Wis. Res. Prot. Council*, 727 F.3d at 708) (cleaned up).

Here, the court concludes that the Rule is neither unconstitutionally vague nor was AWM deprived of fair notice. The SEC argues that, read in context, it's clear that "business as such" plainly refers to "business as a broker or dealer." [Dkt. 80, at 68–69.] The court agrees, and it doesn't think AWM, or any other industry actor, need consult a grammar handbook to conclude as much. *DIRECTV Grp., Inc. v. United States*, 670 F.3d 1370, 1381 (Fed. Cir. 2012) (Gajarsa, J., concurring) (observing that, per "elementary grammar, the statute's use of 'such' is a demonstrative adjective, and it must refer to a clear antecedent"); *Nieves v. United States*, 160 F.2d 11, 12 (D.C. Cir. 1947) (observing that the "word 'such' is restrictive in its effect and obviously relates to an antecedent"). The full phrase is "its business as such," and the "it" in question is a "member, broker or dealer." § 240.17a–4(b)(4). It's difficult to imagine what else "as such" might refer to *except* broker-dealer business matters, and AWM provides no alternative interpretation. Particularly given the "less stringent" standard applicable here, a reasonable person would understand the Rule to apply unambiguously to communications relating to broker-dealer business activities.

This is also consistent with SEC guidance. *See Recordkeeping and Reporting Requirements for Security-Based Swap Dealers, Major Security-Based Swap Participants, and Broker-Dealers*, Exch. Act Release No. 87005, 84 Fed. Reg. 68550, 68552 (Dec. 16, 2019) ("records … must be retained only if they relate to the broker-dealer's business as such (i.e., business as a broker-dealer)"). Not only would AWM be capable of ascertaining this, the complaint alleges that it *did*: "the Arete Wealth Procedures mandated that '[b]usiness-related emails must not be sent from non-Firm approved email accounts' (emphasis added) and required the retention of all 'retail

29

and institutional communications.'" [Dkt. 61, ¶ 62.] The fair-notice challenge is therefore unavailing.

Still, citing two text conversations identified in the FAC—one which the SEC alleges did not violate the Rule, and one which it says did—AWM insists that the lack of guidance permits arbitrary and "imagined line-drawing." [Dkt. 71, at 11.] The first, non-violative conversation from September 2020 reads:



[Dkt. 61, ¶ 322.] Meanwhile, the allegedly violative conversation from December 2020 reads:

- *Jeff Larson*: [New registered representative] is billing on -25M and already has 1.25M of alt tickets in compliance review. She just started doing mtgs with her client and expects that number to grow. Before mtgs, she shows us the client and randy and I help her strategize the alternatives.
- *Arete CEO*: [thumbs up emoji]

[*Id.*, ¶¶ 328–29.] This, AWM says, is an "arbitrary and nonsensical delineation." [Dkt. 85, at 5.] The court cannot agree. The Rule applies to communications relating to business as a broker-dealer, and the conversations appear to fall appropriately on either side of that dividing line. The first is a welcome message; it is generic and not broker-dealer specific. The second, however, appears to touch on investments,

performance, and client engagement. This, then, would relate to broker-dealer business matters, rather than corporate matters more broadly. The apparent delineation, then, follows the basic contours of the statute.

AWM's objection to the SEC's enforcement against text messages is likewise unpersuasive. The term "communications" is not limited by the Rule, which explicitly contemplates both "inter-office" communications and "all communications which are subject to rules of a self-regulatory organization of which the member, broker or dealer is a member regarding communications with the public." § 240.17a–4(b)(4). To that end, the complaint states that FINRA told firms in 2011 that the Rule "would apply if the electronic communication was received or sent by an associated person through a third-party's platform or system." [Dkt. 61, ¶ 59.] AWM insists that this statement carries no legal force or effect, *see* dkt. 71, at 10, yet it nonetheless cited this very guidance as a basis for prohibiting personnel from instant messaging using their personal devices. [*Id.*, ¶¶ 63–64.] Consequently, arguments that it lacked notice of the Rule's scope, or that persons of ordinary intelligence would not understand it to cover off-channel communications, fall flat.[18]

Turning, then, to AWM's argument that the SEC failed to allege a violation, the court concludes that—under a plain-text reading of the statute—the cited text messages plausibly violate the Rule. Contrary to AWM's framing of them as only "logistical, ministerial, administrative and non-substantive," the messages, as alleged, cover what strikes the court as fundamental broker-dealer business matters: customer solicitations, investments, approvals, and fundraising.[19] [*See* Dkt. 61, ¶¶ 328–338.] And, as alleged, these communications were not retained. [*Id.*, ¶ 324.] The SEC has thus met its burden in pleading primary Section 17(a) and Rule 17a–4(b)(4) violations.

---

[18]    AWM makes two additional arguments related to off-channel communications. First, it reasons that repeated industry-wide violations are not evidence of misconduct, but evidence that the SEC failed to articulate clear standards. [Dkt. 71, at 10–11.] But it cannot be necessarily true that, at some point, misconduct is excused simply because it recurs. This flies in the face of logic. Second, AWM highlights public statements from SEC commissioners criticizing the agency's enforcement of off-channel communication recordkeeping. [Dkt. 71, at 13.] Beyond the fact that these statements postdate the violations in question, mere recognition that enforcement is not deterring violations is different than disputing that they exist. Indeed, one such statement, in effect a dissent from an enforcement action, discusses pragmatic enforcement and concludes that the rules should be modernized. *A Catalyst: Statement on Qatalyst Partners LP*, SEC.gov (Sept. 24, 2024), https://www.sec.gov/newsroom/speechesstatements/statement-peirce-uyeda-qatalyst-09242024. But, as of now, the rules say what they say.

[19]    Even if the court was to read into the statute the word "essential," as AWM requests despite its absence, it's not clear what would qualify if not, at minimum, messages pitching investments to clients. [Dkt. 71, at 15.]

Finally, the SEC alleges that the Representatives aided and abetted the recordkeeping violations. [Dkt. 61, ¶ 381.] Arguing for dismissal, the Representatives primarily incorporate AWM's unavailing arguments that the SEC failed to plead a primary violation. [Dkt. 75, at 29.] They also, however, state that there are insufficient allegations as to their "knowing and substantial assistance." [*Id.*] Once more, the court disagrees. Indeed, at issue are text messages that they sent but failed to retain, despite Arete policies against texting. [Dkt. 61, ¶ 339.] Not only does the complaint detail these policies (and their relationship to the Rule), *id.*, ¶¶ 63–64, it also documents, at length, the Representatives' efforts to evade Arete review through off-channel communications. [*See id.*, ¶¶ 168–77, 231.[20]] A more-than-reasonable inference suggests that the Representatives knew the text messages—which they sent—would not be retained, and improperly so. This suffices at the pleading stage.

Claims VIII and IX therefore survive, too.

## IV. Conclusion

Accordingly, the court dismisses without prejudice only the following: Claims I and II in part, as they concern allegations of Miller and Jeff Larson hiding their activities from Arete; Claim III in part, as it concerns false information in the releases; and Claim IV in full.[21] Both motions to sever are denied without prejudice.

Enter: 25-cv-616
Date:   February 26, 2026

Lindsay C. Jenkins

---

[20]    Because these claims implicate the same Representatives, their communications, and (like the fraud claims) their knowledge that their text messages were not retained, the court declines to sever Claim VIII, as AWM requests. The apparent overlap in parties, sources of evidence, and witnesses motivates this result. *See BCBSM, Inc. v. Walgreen Co.*, at *2 (N.D. Ill. Nov. 22, 2022). The denial is without prejudice.

[21]    What remains is this: Against Miller and Jeff Larson, Claims I, II, and III survive insofar as they concern misrepresentations and omissions involving the receipt of discounted shares (and, as to Larson, misrepresentations as to what Arete knew). Against all three Representatives, Claims V and IX survive for violating the Exchange Act's registration requirement, and for aiding and abetting its Recordkeeping Rule violation. Against AWA, Claim III survives insofar as it concerns purported deception involving waivers of its fiduciary duties—as does Claim VI, for violating the Advisers Act's Compliance Rule. Against Chung, Claim VII for aiding and abetting the Compliance Rule survives. And against AWM, Claim VIII for violating the Recordkeeping Rule survives.